**Ted SPIEGEL, Plaintiff Below, Appellant,**

v.

**Dean L. BUNTROCK, Jerry E. Dempsey, Peter H. Huizenga, James E. Koenig, Alexander Trowbridge, Lee L. Morgan, Peer Pedersen, Olin N. Emmons, James R. Peterson, Donald F. Flynn, Phillip B. Rooney and Waste Management, Inc., Defendants Below, Appellees.**

Supreme Court of Delaware.

Submitted: Dec. 12, 1989.
Decided: March 19, 1990.

---

Joseph A. Rosenthal (argued), and Kevin Gross of Morris, Rosenthal, Monhait & Gross, P.A., Wilmington, and Mordecai Rosenfeld, New York City, on behalf of appellant.

Clark W. Furlow (argued), of Lassen, Smith, Katzenstein & Furlow, Wilmington, Wallace L. Timmeny (argued), James E. Ballowe, Jr. of McGuire, Woods, Battle & Booth, Washington, D.C., and F.L. Peter Stone of Connolly, Bove, Lodge & Hutz, Wilmington, on behalf of appellees.

Before HORSEY, WALSH and HOLLAND, Justices.

HOLLAND, Justice:

This is an appeal from an order of the Court of Chancery dismissing a derivative action filed by the plaintiff-appellant, Ted Spiegel ("Spiegel"), a shareholder of Waste Management, Inc. ("Waste Management"). In his complaint, Spiegel alleged that Dean L. Buntrock ("Buntrock"), Chairman of the Board of Directors and Chief Executive Officer of Waste Management; Jerry E. Dempsey ("Dempsey"), Vice Chairman; Peter H. Huizenga ("Huizenga"), Vice President and Secretary; and James E. Koenig ("Koenig"), Staff Vice President[1] (collectively "management defendants"), improperly acquired stock in ChemLawn Corporation ("ChemLawn"), based upon inside information, during the two years immediately preceding Waste Management's tender

---

1. All of the management defendants, except Koenig, are also directors of Waste Management.

offer for ChemLawn. Spiegel sought to compel the management defendants to account to Waste Management for the personal profits they made upon the sale of their ChemLawn stock.

The underlying issue in this controversy is the often debated subject of when the requirement that a stockholder make demand on a board of directors, prior to filing a derivative lawsuit for the benefit of a corporation, is excused and when a demand, which has been made, is properly refused. Superimposed upon the "demand excused/demand refused" debate[2] are additional issues relating to the use of a special litigation committee by the Board of Waste Management, and the propriety of continuing to argue that demand was excused, after a demand has been made. All of the issues raised implicate the proper standard of judicial review.

This case presented the Court of Chancery with a procedural paradox in that each party's argument was the antithesis of their action. Spiegel contended that demand was excused. However, when his failure to make a pre-suit demand was raised by the Board of Waste Management ("Board") as a defense, Spiegel responded by filing a demand. The Board contended that demand was required, because it was disinterested and capable of responding to Spiegel's request for legal action. However, when a demand for such action was made by Spiegel, the Board responded by appointing a special litigation committee with complete authority to review and act upon Spiegel's request. Ultimately, each party used their opponent's legal sword as their own legal shield. Spiegel argued that by appointing a special litigation committee, the Board conceded that demand was excused and the Board argued that by filing a demand Spiegel had admitted that one was required.

The Court of Chancery carefully reviewed the allegations in Spiegel's complaint and found that demand was not excused. Thereafter, the Court of Chancery proceeded to examine the post-suit demand for legal action, which was sent to the Board by Spiegel, and the decision to refuse that demand. The Court of Chancery held that the decision to refuse Spiegel's demand was subject to review according to the traditional business judgment rule, notwithstanding the fact that the Board had delegated its authority to act on Spiegel's demand to a special litigation committee. Applying the traditional business judgment rule, the Court of Chancery held that Spiegel's demand, for the Board to take legal action on behalf of Waste Management, was properly refused.

On appeal, Spiegel contends that, even though he made a demand, given the facts of this case, demand was excused nevertheless. Therefore, Spiegel argues that the Court of Chancery should have reviewed the Board's motion to dismiss his complaint according to the procedures established in *Zapata Corp. v. Maldonado,* Del.Supr., 430 A.2d 779 (1981), rather than the traditional business judgment rule. Alternatively, Spiegel contends that even if the *Zapata* procedures are not applicable in this case, the Court of Chancery erred in dismissing his derivative complaint because Waste Management failed to meet its burden under Chancery Court Rule 56 of showing that there were no genuine issues of material fact.

We find that the record supports both of the Court of Chancery's rulings. Consequently, it is not necessary to address the other issues raised by Spiegel. We find that the Court of Chancery's decision to dismiss Spiegel's complaint should be affirmed.

### Facts

Waste Management is a Delaware corporation headquartered in Oak Brook, Illinois. It provides domestic and international waste removal and disposal services. In the spring of 1984, Waste Management decided to diversify its operations by expanding into new service areas.

---

**2.** See Dooley & Veasey, *The Role of the Board in Derivative Litigation: Delaware Law and the Current ALI Proposals Compared,* 44 Bus.Law. 503 (1989). *See also Bach v. National W. Life Ins. Co.,* 810 F.2d 509, 513–14 (5th Cir.1987).

In an effort to accomplish its goal, Waste Management hired Dempsey, who had led the successful diversification of Borg Warner Corporation.[3] Buntrock requested Dempsey to perform a study of service industries which might be of interest to Waste Management. Dempsey retained the consulting division of Arthur Andersen & Co. to assist him with the study.

Dempsey prepared two reports, dated February 8, 1985 and March 13, 1985. The reports were titled "Waste Management, Inc. Acquisition Project Meeting." Both reports were presented to the Board by Dempsey. ChemLawn, a leader in the lawn care industry, was among eight companies included in each initial analysis. During the next two years, several additional reports were prepared to assist the Board in evaluating companies for potential acquisition.

Waste Management's interest in ChemLawn gradually intensified until on February 26, 1987, it launched a cash tender offer for ChemLawn at $27.00 per share.[4] The tender offer included a disclosure that the management defendants owned shares of ChemLawn stock, which they had acquired during the prior two years.[5] Waste

Management's tender offer proved to be unsuccessful.

ChemLawn was purchased by EcoLab, Inc. for $36.50 per share. On March 30, 1987, the *Wall Street Journal* carried an article entitled "ChemLawn's Sale Could Yield $1 Million In Profit for Officials of Thwarted Suitor."[6] That same day, Spiegel filed the action against Waste Management, and its directors, that is the subject of this appeal.

On April 30, 1987, the Board filed a motion to dismiss Spiegel's complaint pursuant to Court of Chancery Rule 23.1. The basis for that motion was that Spiegel had failed to make a demand upon the Board prior to instituting his derivative suit and had failed to allege with particularity facts demonstrating that such a demand would have been futile. *See* Ch.Ct.R. 23.1.[7] The Board's motion also sought dismissal of the action against the seven disinterested directors because Spiegel's complaint alleged no wrongdoing by them.

Spiegel did not immediately contest the Board's motion to dismiss in the Court of Chancery.[8] Instead, Spiegel responded by making a demand to the Board in a letter which stated:

| Purchaser | # of Shares |
| --- | --- |
| Mr. Buntrock* | 35,000 |
| Huizenga | 8,000 |
| Dempsey | 4,000 |
| Koenig | 400 |

*Mr. Buntrock's total purchases include not only his personal purchases, but also those made by his wife and by trust funds established for the Buntrocks' children.

3. With Dempsey's leadership, Borg Warner Corporation evolved from a primarily manufacturing enterprise, to the point where service industries comprised the majority of its overall operations.

4. On February 25, 1987, Waste Management sued ChemLawn to invalidate the anti-takeover laws of Ohio, ChemLawn's state of incorporation. ChemLawn counterclaimed, seeking to enjoin Waste Management's takeover bid. Among the allegations in ChemLawn's counterclaim was the charge that Buntrock, Huizenga, Dempsey and Koenig had acquired ChemLawn shares in violation of federal and state prohibitions against trading on inside information. After EcoLab, Inc. acquired ChemLawn, the Ohio litigation was voluntarily dismissed.

5. The purchases of ChemLawn stock occurred between May 8, 1985, and February 5, 1987. They may be summarized as follows:

6. In March and April, 1987, the management defendants tendered all of their 47,400 shares of ChemLawn stock to EcoLab, Inc. during its successful tender offer, at prices ranging from $36.25 to $36.50 per share.

7. Chancery Court Rule 23.1 states, in part:
 The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action he [or she] desires from the directors or comparable authority and the reasons for his [or her] failure to obtain the action or for not making the effort.

8. The Court of Chancery set a brief schedule in order to properly act upon the Board's motion. That brief schedule was apparently abandoned by the parties after Spiegel filed his demand.

On behalf of Ted Spiegel, a shareholder of Waste Management, Inc., we hereby formally demand that the Board of Directors take all appropriate action to redress the wrongs as alleged in the enclosed complaint.

In response to Spiegel's demand letter, the Board established a special litigation committee of outside directors (the "Committee") "for the purpose of conducting an independent review of the transactions in the common stock of ChemLawn Corporation by officers of the Company."[9] "Pursuant to Section 141(c) of the Delaware General Corporation Law and [Waste Management's] by-laws," the Board delegated authority to the Committee "to determine, as a result of its independent review, whatever action may be appropriate in the interest of the Company...."

The Committee conducted an investigation into Spiegel's allegations that spanned over five months. The Committee was represented by its own independent counsel, a Washington, D.C., attorney who was the former Deputy Director of Enforcement at the Securities and Exchange Commission, and who now specializes in securities law in private practice. The Committee interviewed a great many people, both within and without Waste Management.[10] It also reviewed volumes of documents.

The Committee's report found that Waste Management had a continuing low level interest in ChemLawn, as one of many possible acquisition targets, throughout the two-year period in question, but that there was never any "serious interest" until January and February of 1987. On the basis of its investigation, and its analysis of the applicable law, the Committee concluded that it would not be in the best interests of Waste Management and its

stockholders to pursue Spiegel's derivative action. The Committee's report stated, in part:

The Committee has determined to seek dismissal of the complaints in the pending derivative litigation. The Committee believes that the best interests of the Company would be furthered by terminating rather than pursuing the derivative litigation.... There is no question that ... discovery would be disruptive and burdensome in the extreme to the Company, its employees, and its directors. In addition, the publicity which would accompany the continuation of the lawsuit would result in immediate damage to the Company's goodwill and reputation with its shareholders, its customers, and the investment community, even though the allegations in the complaint ultimately proved meritless.

Against these burdens, the Committee has weighed the potential for success by the plaintiffs on their claim of insider trading and has concluded that the plaintiffs have proffered no evidence, and the Committee in its investigation has uncovered no evidence, that would support this serious charge of unlawful conduct.

Consequently, the Committee, acting for the Board, filed a motion on behalf of Waste Management, in the Court of Chancery to dismiss or, alternatively, for summary judgment, along with the affidavits of the Committee members and the entire report which summarized its findings and analysis.

### Derivative Action/Demand Requirement

 A basic principle of the General Corporation Law of the State of Delaware is that directors, rather than shareholders,

The Court of Chancery's docket sheet indicates the next action taken with respect to this case was the filing of a motion to dismiss or, alternatively, for summary judgment by a special litigation committee appointed by the Board to investigate and respond to Spiegel's claims.

**9.** The Committee's chairman was Lee L. Morgan, the most recent appointee to the Board and the retired chairman of Caterpillar, Inc. The other two members of the Committee were Olin

Neill Emmons, a financial analyst and vice-president of Oberweis Securities, Inc., and James R. Peterson, a former officer and director of the Pillsbury Company, R.J. Reynolds Industries, Inc., and the Parker Pen Company.

**10.** The Committee interviewed Spiegel's attorney. Spiegel's counsel advised the Committee that the allegations in the complaint were based solely on the article reported on March 30, 1987, in the *Wall Street Journal.*

manage the business and affairs of the corporation. *Paramount v. Time,* Del. Supr., 571 A.2d 735, 738, 751 (1990); *Mills Acquisition Co. v. Macmillan, Inc.,* Del. Supr., 559 A.2d 1261, 1280 (1989); *Kaplan v. Peat, Marwick, Mitchell & Co.,* Del. Supr., 540 A.2d 726, 729 (1988); *Pogostin v. Rice,* Del.Supr., 480 A.2d 619, 624 (1984); *Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 811–12 (1984). "The exercise of this managerial power is tempered by fundamental fiduciary obligations owed by the directors to the corporation and its shareholders." *Kaplan v. Peat, Marwick, Mitchell & Co.,* 540 A.2d at 729. The decision to bring a law suit or to refrain from litigating a claim on behalf of a corporation is a decision concerning the management of the corporation. *Zapata Corp. v. Maldonado,* 430 A.2d at 782. Consequently, such decisions are part of the responsibility of the board of directors. 8 *Del.C.* § 141(a).[11]

■ Nevertheless, a shareholder may file a derivative action to redress an alleged harm to the corporation. The nature of the derivative action is two-fold.

First, it is the equivalent of a suit by the shareholders to compel the corporation to sue. Second, it is a suit by the corporation, asserted by the shareholders on its behalf, against those liable to it.

*Aronson v. Lewis,* 473 A.2d at 811. In essence, it is a challenge to a board of directors' managerial power. *Pogostin v. Rice,* 480 A.2d at 624. Thus, by its very nature, "the derivative action impinges on the managerial freedom of directors." *Id.* In fact, the United States Supreme Court has noted that the shareholder derivative action "could, if unrestrained, undermine the basic principle of corporate governance that the decisions of a corporation—including the decision to initiate litigation—should be made by the board of directors or the majority of shareholders." *Daily In-*

come Fund, Inc. v. Fox, 464 U.S. 523, 531, 104 S.Ct. 831, 836, 78 L.Ed.2d 645 (1984) (citing *Hawes v. Oakland,* 104 U.S. 450, 26 L.Ed. 827 (1882)). *See Kaplan v. Peat, Marwick, Mitchell & Co.,* 540 A.2d at 730.

"Because the shareholders' ability to institute an action on behalf of the corporation inherently impinges upon the directors' power to manage the affairs of the corporation the law imposes certain prerequisites on a stockholder's right to sue derivatively." *Kaplan v. Peat, Marwick, Mitchell & Co.,* 540 A.2d at 730 (citing *Pogostin v. Rice,* 480 A.2d at 624); *Aronson v. Lewis,* 473 A.2d at 811. Chancery Court Rule 23.1 requires that shareholders seeking to assert a claim on behalf of the corporation must first exhaust intracorporate remedies by making a demand on the directors to obtain the action desired, or to plead with particularity why demand is excused. Ch. Ct.R. 23.1; *Kaplan v. Peat, Marwick, Mitchell & Co.,* 540 A.2d at 730. *See also Aronson v. Lewis,* 473 A.2d at 811–812; *Zapata Corp. v. Maldonado,* 430 A.2d at 783.[12]

The purpose of pre-suit demand is to assure that the stockholder affords the corporation the opportunity to address an alleged wrong without litigation, to decide whether to invest the resources of the corporation in litigation, and to control any litigation which does occur. *Kaplan v. Peat, Marwick, Mitchell & Co.,* 540 A.2d at 730.[13] "[B]y promoting this form of alternate dispute resolution, rather than immediate recourse to litigation, the demand requirement is a recognition of the fundamental precept that directors manage the business and affairs of corporations." *Aronson v. Lewis,* 473 A.2d at 812.

### *Standard Of Review Demand Excused/Demand Refused*

■ Since a conscious decision by a board of directors to refrain from acting

---

**11.** 8 *Del.C.* § 141(a) provides, in pertinent part:
The business and affairs of every corporation organized under this chapter shall be managed by a board of directors, except as may be otherwise provided in this chapter or in its certificate of incorporation.

**12.** The United States Supreme Court recognized the demand requirement, as an embodiment of

the director's prerogative to control a corporation's business and affairs, over a century ago in *Hawes v. Oakland,* 104 U.S. 450, 26 L.Ed. 827 (1882).

**13.** *See* DeMott, *Demand in Derivative Actions: Problems of Interpretation and Function,* 19 U.C. Davis L.Rev. 461, 484–94 (1986).

may be a valid exercise of business judgment, "where demand on a board has been made and refused, [courts] apply the business judgment rule in reviewing the board's refusal to act pursuant to a stockholder's demand" to file a lawsuit. *Id.* at 813 (citing *Zapata Corp. v. Maldonado*, 430 A.2d at 784 & n. 10). The business judgment rule is a presumption that in making a business decision, not involving self-interest, the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company. *Grobow v. Perot*, Del.Supr., 539 A.2d 180, 187 (1988); *Aronson v. Lewis*, 473 A.2d at 812.[14] "The burden is on the party challenging the decision to establish facts rebutting th[is] presumption." *Aronson v. Lewis*, 473 A.2d at 812. Thus, the business judgment rule operates as a judicial acknowledgement of a board of directors' managerial prerogatives. *Id.*

Spiegel submits that judicial review according to the traditional business judgment rule was inappropriate in his case. Spiegel sets forth two separate arguments in support of his position. First, that the allegations set forth in his complaint support a finding that demand was excused, according to this Court's holding in *Aronson*, notwithstanding the fact that he made a demand upon the Board. Second, and alternatively, that by appointing a special litigation committee with full authority to respond to his demand, the Board waived its right to challenge his allegation that demand was excused, and thereby invoked the special procedures for judicial review established in *Zapata Corp. v. Maldonado*, Del.Supr., 430 A.2d 779 (1981). We shall examine each of Spiegel's contentions.

### Demand Made/Futility Waived

Spiegel filed a derivative action on behalf of Waste Management, alleging that a pre-suit demand on the Board was excused, i.e., would have been a futile gesture. However, Spiegel then filed a demand with the Board to take legal action and "redress the wrongs" set forth in his complaint. Spiegel alleges that he was entitled to simultaneously argue these inconsistent arguments. The Board argues that when Spiegel filed his demand, he waived his right to continue asserting that demand was excused. The Court of Chancery gave implicit recognition to the validity of Spiegel's position by examining the merits of both of his arguments.[15]

"When deciding a motion to dismiss for failure to make a demand under Chancery Rule 23.1 the record before the court must be restricted to the allegations of the complaint." *Kaplan v. Peat, Marwick, Mitchell & Co.*, 540 A.2d at 727–28. *See also Grobow v. Perot*, 539 A.2d at 187; *Pogostin v. Rice*, 480 A.2d at 622–24; *Aronson v. Lewis*, 473 A.2d at 809. In determining demand futility, the Court of Chancery must decide whether, under the particularized facts alleged in the complaint:

[A] reasonable doubt is created that: (1) the directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment.

*Aronson v. Lewis*, 473 A.2d at 814. In this case, the Court of Chancery concluded that the facts alleged in Spiegel's complaint did not raise a reasonable doubt that the Board was disabled from responding to Spiegel's demand and passing upon whether it was in Waste Management's interest to pursue Spiegel's claims.

Spiegel argues that, even though he made a demand, the Court of Chancery properly reviewed the merits of his complaint, which alleged that demand was excused. Spiegel submits that demand

---

**14.** The protections of the business judgment rule can only be invoked by disinterested directors. *Aronson v. Lewis*, 473 A.2d at 812, 815 n. 8. However, the fact that all directors are named as defendants in a derivative complaint is not determinative of their lack of independence. *Id.* at 817–18; *Pogostin v. Rice*, 480 A.2d at 625.

**15.** The federal district court in Delaware has also reviewed a futility of demand argument subsequent to the filing of a demand. *Allison on Behalf of G.M.C. v. General Motors Corp.*, 604 F.Supp. 1106 (D.Del.), *aff'd*, 782 F.2d 1026 (3d Cir.1985).

should be encouraged by permitting a demand to be made, while at the same time permitting the argument, that demand was excused, to be preserved. Spiegel finds some support for his position in other jurisdictions. *See Bach v. National W. Life Ins. Co.*, 810 F.2d 509, 513 (5th Cir.1987); *Joy v. North*, 692 F.2d 880, 888 n. 7 (2d Cir.1982), *cert. denied*, 460 U.S. 1051, 103 S.Ct. 1498, 75 L.Ed.2d 930 (1983); *Alford v. Shaw*, 72 N.C.App. 537, 324 S.E.2d 878, 883 n. 2 (1985), *aff'd and modified on other grounds*, 320 N.C. 465, 358 S.E.2d 323 (1987). However, this Court has held that by making a demand, a shareholder thereby makes his original contention, that demand was excused, moot. *Stotland v. GAF Corp.*, Del.Supr., 469 A.2d 421 (1983).

In *Stotland,* the shareholders' original derivative complaint did not allege that a demand had been made on the corporation's board of directors. The Court of Chancery denied the shareholders' motion to amend their complaint, and ordered the action dismissed due to the shareholders' failure either to make a demand or properly demonstrate its futility. *Id.* at 422. Following the dismissal, the shareholders made a demand on the board, and then filed an appeal from the dismissal, on grounds that a demand would have been futile. The board of directors appointed a special litigation committee to review the demand. That process was still in progress at the time when the shareholders' appeal was heard by this Court. We concluded that, by making the demand, the shareholder mooted his appeal, which was based on the issue of demand futility. We held that "once a demand has been made, absent a

wrongful refusal, the stockholders' ability to initiate a derivative suit is terminated." *Id.* at 422 (citing *Zapata Corp. v. Maldonado*, 430 A.2d at 784–86).

This Court has recently held that when a board of directors is confronted with a derivative action asserted on its behalf, it cannot stand neutral. *Kaplan v. Peat, Marwick, Mitchell & Co.*, 540 A.2d at 731. The Board "must affirmatively object to or support the continuation of the [derivative] litigation." *Id.* Similarly, a stockholder who asserts a derivative claim cannot stand neutral, in effect, with respect to the board of directors' ability to respond to a request to take legal action, by simultaneously making a demand for such action *and* continuing to argue that demand is excused.

By making a demand, a stockholder tacitly acknowledges the absence of facts to support a finding of futility. *Cf. Kaplan v. Peat, Marwick, Mitchell & Co.*, 540 A.2d at 731. Thus, when a demand is made, the question of whether demand was excused is moot. *Stotland v. GAF Corp.*, 469 A.2d at 422–23. Our decision in *Stotland* is applicable to Spiegel's case. Therefore, we hold once Spiegel made a demand, it was unnecessary for the Court of Chancery to consider the merits of Spiegel's argument that demand was excused. *Id.* at 423.

■■■■ A shareholder who makes a demand can no longer argue that demand is excused. *Id.*[16] The effect of a demand is to place control of the derivative litigation in the hands of the board of directors. *Zapata Corp. v. Maldonado*, 430 A.2d at 784–86.[17] Consequently, stockholders who,

---

**16.** The federal district court in Delaware recognized the potential for the establishment of a rule in Delaware that a derivative plaintiff's assertion that demand is excused is mooted once demand is made. *Allison on Behalf of G.M.C. v. General Motors Corp.*, 604 F.Supp. at 1119 n. 12.

**17.** "[*Stotland*] thus treats the demand requirement as an aspect of the allocation of managerial powers within the corporation. The case also creates a substantial practical dilemma for the plaintiff: if no demand is made, the suit may and probably will be dismissed, but once the demand is made, the plaintiff can no longer maintain that demand should be excused." D.

DeMott, *Shareholder Derivative Actions: Law and Practice*, § 5:03 (1987). We recognize this reaffirmation of our decision in *Stotland* requires a shareholder to make an election between filing a demand and filing a derivative action without a demand. We also recognize that "the entire question of demand futility is inextricably bound to issues of business judgment and the standards of that doctrine's applicability." *Aronson v. Lewis*, 473 A.2d at 812. However, this shareholder "dilemma" is not a Hobson's choice. "[U]nder *Zapata* and its progeny, a plaintiff who can establish demand futility not only avoids the need to make a demand which the corporation may refuse, but, at least in Delaware, also may be able to obtain judicial

like Spiegel, make a demand which is refused, subject the board's decision to judicial review according to the traditional business judgment rule. *Aronson v. Lewis*, 473 A.2d at 813; *Zapata Corp. v. Maldonado*, 430 A.2d at 784 n. 10.

### Special Litigation Committee

Alternatively, Spiegel argues that even though demand was made, the Board admitted that demand was excused by referring his demand to a special litigation committee, and by delegating to that committee the complete power to determine the Board's litigation posture.[18] Therefore, Spiegel argues that the Board's rejection of his demand was subject to judicial review according to the special procedures set forth in *Zapata*, and not the traditional business judgment rule.[19] In support of that position, Spiegel cites *Abbey v. Computer & Comm. Tech. Corp.*, Del.Ch., 457 A.2d 368 (1983). The Court of Chancery found *Abbey* to be distinguishable and rejected Spiegel's argument. We agree with the Court of Chancery.

The facts upon which the *Abbey* decision was based are different from the facts of this case. In *Abbey*, the plaintiff made demand on the corporation's board of directors *and then filed suit* alleging that demand was excused. The board responded to the complaint in *Abbey* by appointing a new board member to serve as a one-man special litigation committee, and delegated full authority to him to handle the derivative action. The board in *Abbey* never made any attempt to address the derivative litigation itself. The Court of Chancery concluded, in *Abbey*, that the board had, "in effect, conceded its disqualification, and ... thereby conceded [that demand was excused and that] the plaintiff [was entitled] to bring the [derivative] suit without awaiting word from it...." 457 A.2d at 374.

This case is the procedural reverse of *Abbey*. Spiegel filed his derivative suit without first making demand. The Board immediately took charge of the litigation and filed a motion to dismiss Spiegel's complaint for his failure to make a demand in accordance with Rule 23.1. Spiegel responded to the Board's motion by making a demand. In response to Spiegel's demand, the Board created a special litigation committee.

The significance of this procedural distinction was recognized by the Court of Chancery in *Richardson v. Graves*, Del. Ch., C.A. No. 6617, Longobardi, V.C. (June

---

review of the *merits* of the case as part of the court's evaluation of any motion to terminate made by a special litigation committee acting on behalf of the corporation." D. Block, N. Barton & S. Radin, *The Business Judgment Rule: Fiduciary Duties of Corporate Directors*, 484 (3d Ed. 1989).

18. A board of directors may delegate its managerial authority to a committee of directors. 8 *Del.C.* § 141(c). Even when a majority of a board of directors is independent, one advantage of establishing a special litigation committee is to isolate the interested directors from material information during either the investigative or decisional process. *Cf. Mills Acquisition Co. v. Macmillan, Inc.*, Del.Supr., 559 A.2d 1261 (1988). In this case, Spiegel emphasizes the difference between a Board's "delegation of its decision-making authority—as opposed to its investigative authority—" to a committee. *See* D. Block, N. Barton & S. Radin, *The Business Judgment Rule: Fiduciary Duties of Corporate Directors*, 476–77 n. 180, 485–88 (3d Ed.1989). *See also*, D. Drexler, L. Black, and G. Sparks, *Delaware Corporate Law & Practice*, § 42.03[2][c] (1990).

19. As this Court noted in *Aronson:*

The thrust of *Zapata* is that in either the demand-refused or the demand-excused case, the board still retains its Section 141(a) managerial authority to make decisions regarding corporate litigation.... Thus, even in a demand-excused case, a board has the power to appoint a committee of one or more independent disinterested directors to determine whether the derivative action should be pursued or dismissal sought. Under *Zapata*, the Court of Chancery, in passing on a committee's motion to dismiss a derivative action in a demand excused case, must apply a two-step test. First, the court must inquire into the independence and good faith of the committee and review the reasonableness and good faith of the committee's investigation. Second, the court must apply its own independent business judgment to decide whether the motion to dismiss should be granted.

*Aronson v. Lewis*, 473 A.2d at 813 (citations omitted).

17, 1983). The plaintiff in *Richardson*, like Spiegel, relying on *Abbey*, argued that the board of directors had conceded that demand was excused as futile by the appointment of a special litigation committee. In *Richardson*, the Court of Chancery distinguished *Abbey* on the grounds that the board in *Abbey* did not file a motion to dismiss pursuant to Rule 23.1 until *after* it had surrendered exclusive control of the derivative action to a special litigation committee. *Richardson v. Graves*, slip op. at 10–11. By contrast, the *Richardson* board, like the Waste Management board, *first* filed a motion to dismiss Spiegel's complaint due to his failure to make a demand and *later*, after Spiegel did make a demand, appointed a special litigation committee to respond to that demand. In *Richardson*, the court held:

> [T]he facts here do not support a finding of concession on the part of the Defendants [, the board of directors,] or divestment of their power at the time they moved to dismiss. The Defendants here filed a proper motion to dismiss and consistent with the policy of [Rule] 23.1 must in the first instance be afforded the opportunity to control the litigation.

*Richardson v. Graves*, slip op. at 11.

In this case, we find that the Court of Chancery properly rejected Spiegel's argument that *Abbey* stands for the proposition that a board of directors, *ipso facto*, waives its right to challenge a shareholder plaintiff's allegation that demand is excused by the act of appointing a special litigation committee and delegating to that committee the authority to act on the demand. Not only are the facts in *Abbey* procedurally different from those of the present case, but *Abbey* itself specifically recognizes the right of a board of directors to appoint committees to address derivative litigation, without automatically subjecting the committee's decision to the two-tier level of judicial scrutiny established in *Zapata*. In *Abbey*, the Court of Chancery properly concluded that the special review procedure which this Court set up in *Zapata* applies:

> only in a situation where, because of some alleged self-interest, the board of directors is disqualified from acting itself. Otherwise, but for the disqualifying self-interest factor, the board could make its decision for itself, whether it chose to do so through a committee or not, and cause an appropriate motion to be made on behalf of the corporation just as in any normal suit in which the corporation was named as a party defendant.

*Abbey v. Computer & Comm. Tech. Corp.*, 457 A.2d at 373. In this case, the Court of Chancery held that the decision of a board of directors to appoint a special litigation committee, with a delegation of complete authority to act on a demand, is not, *in all instances*, an acknowledgement that demand was excused and *ergo* that a shareholder's lawsuit was properly initiated as a derivative action. We affirm that holding.

### *Standard Of Review Demand Refused/Motion To Dismiss*

Whenever any action or inaction by a board of directors is subject to review according to the traditional business judgment rule, the issues before the Court are independence, the reasonableness of its investigation and good faith. By electing to make a demand, a shareholder plaintiff tacitly concedes the independence of a majority of the board to respond. Therefore, when a board refuses a demand, the only issues to be examined are the good faith and reasonableness of its investigation.

Absent an abuse of discretion, if the requirements of the traditional business judgment rule are met, the board of directors' decision not to pursue the derivative claim will be respected by the courts. *Aronson v. Lewis*, 473 A.2d at 812; *Zapata Corp. v. Maldonado*, 430 A.2d at 784–85. In such cases, a board of directors' motion to dismiss an action filed by a shareholder, whose demand has been rejected, must be granted.[20] "If Courts would not respect

---

**20.** "The function of the business judgment rule is of paramount significance in the context of a derivative action. It comes into play in several ways—in addressing a demand, in the determination of demand futility, in efforts by independent disinterested directors to dismiss the action as inimical to the corporation's best interests, and generally, as a defense to the merits of the

the directors' decision not to file suit, then demand would be an empty formality." *Starrels v. First Nat. Bank of Chicago,* 870 F.2d 1168, 1174 (7th Cir.1989) (Easterbrook, J., concurring).

 The same standard of judicial review is applicable when a board delegates authority to respond to a demand to a special litigation committee. The issues are solely the good faith and the reasonableness of the committee's investigation. *Zapata Corp. v. Maldonado,* 430 A.2d at 787. "The ultimate conclusion of the [special litigation] committee ... is *not* subject to judicial review." *Id.* (emphasis added). Judicial review of the merits of a special litigation committee's decision to refuse a demand is limited to those cases where demand upon the board of directors is excused and the board has decided to regain control of litigation through the use of an independent special litigation committee. *Aronson v. Lewis,* 473 A.2d at 813–14; *Zapata Corp. v. Maldonado,* 430 A.2d at 787. *Cf. Alford v. Shaw,* 320 N.C. 465, 358 S.E.2d 323, 327 (1987).

 The Court of Chancery specifically recognized this important distinction. In this case, the Court of Chancery found there was no material dispute that the Board, through its Committee, had "function[ed] effectively ... in a way that fully satisfies the prerequisites for the application of the business judgment rule." [21] Consequently, the Court of Chancery concluded that, in accordance with the business judgment expressed by the Board, through its Committee, Spiegel's derivative action had to be dismissed. *Grobow v. Perot,* Del.Supr., 539 A.2d 180 (1988); *Aronson v. Lewis,* Del.Supr., 473 A.2d 805 (1984). We agree.

### Conclusion

For the reasons stated in this opinion, the ultimate decision of the Court of Chancery, dismissing Spiegel's complaint is AFFIRMED.

suit." *Aronson v. Lewis,* 473 A.2d at 812. "When used in this manner, the rule is said to be applied 'offensively'—it is used not to defend the propriety of the underlying action but rather to secure dismissal of the suit without reaching the merits of the claim." D. Block, N. Barton & S. Radin, *The Business Judgment Rule: Fiduciary Duties of Corporate Directors,* 492 (3d Ed. 1989) (citing D. DeMott, *Shareholder Derivative Actions: Law and Practice* § 5:04 (1987)); Block & Prussin, *Termination of Derivative Suits Against Directors on Business Judgment Grounds: From Zapata to Aronson,* 39 Bus.Law. 1503 (1984); Block, Prussin & Wachtel, *Dismissal of Derivative Actions Under the Business Judgment Rule: Zapata One Year Later,* 38 Bus. Law. 401 (1983); Sparks & Conan, *Litigation Committees,* 16 Rev.Sec.Reg. 817 (1983); Cox, *Searching for the Corporation's Voice in Derivative Suit Litigation: A Critique of Zapata and the ALI Project,* 1982 Duke L.J. 959 (1982); Payson, Goldman & Inskip, *After Maldonado—The Role of the Special Litigation Committee in the Investigation .and Dismissal of Derivative Suits,* 37

Bus.Law. 1199 (1982); Veasey, *Seeking a Safe Harbor from Judicial Scrutiny of Directors' Business Decisions—An Analytical Framework for Litigation Strategy and Counselling Directors,* 37 Bus.Law. 1247 (1982); Block & Prussin, *The Business Judgment Rule and Shareholder Derivative Actions: Viva Zapata?,* 37 Bus.Law. 27 (1981).

21. Although the Court of Chancery held that a pre-suit demand was required and not made, it did not dismiss Spiegel's complaint on that basis alone. Thereafter, it re-examined Spiegel's complaint, following the rejection of his post-suit demand, based upon the Committee's motion to dismiss. *Cf. Weiss v. Temporary Inv. Fund, Inc.,* 692 F.2d 928, 943 (3d Cir.1982), *aff'g* 520 F.Supp. 1098, 1100 (D.Del.1981), *vacated and remanded on other grounds,* 465 U.S. 1001, 104 S.Ct. 989, 79 L.Ed.2d 224 (1984); *Grossman v. Johnson,* 674 F.2d 115, 125–26 (1st Cir.), *cert. denied,* 459 U.S. 838, 103 S.Ct. 85, 74 L.Ed.2d 80 (1982).