Robert L. Reese, derivatively on behalf of BRISTOL-MYERS SQUIBB COMPANY, Plaintiff,

against
Lamberto Andreotti, MICHAEL GROBSTEIN, LAURIE H. GLIMCHER, ALAN J. LACY, GERALD L. STORCH, DINESH C. PALIWAL, GIOVANNI CAFORIO, M.D., TOGO D. WEST, JR., VICKI L. SA TO, Ph.D., THOMAS J. LYNCH, JR., M.D., and PETER J. ARDUINI, Defendants, and BRISTOL-MYERS SQUIBB COMPANY, a Delaware corporation, Nominal Defendant.


654132/2016

Harwood Feffer LLP and the Law Office of Alfred G. Yates Jr. PC, for plaintiff.
Kirkland & Ellis LLP, for defendants.


Shirley Werner Kornreich, J.

Nominal defendant Bristol-Myers Squibb Company (the Company) and the individual defendants, members of the Company's board of directors (collectively, the Board), move, pursuant to CPLR 3211, to dismiss plaintiff Robert L. Reese's amended complaint (the AC). Plaintiff opposes the motion. For the reasons that follow, defendants' motion is granted.
I. Factual Background & Procedural History
As this is a motion to dismiss, the facts recited are taken from the AC (Dkt. 9)[FN1]
and the documentary evidence submitted by the parties.
The Company is a Delaware corporation. Plaintiff is a stockholder of the Company. In [*2]this derivative action, plaintiff asserts a Caremark claim [FN2]
against the Board for their alleged knowing, reckless, and grossly negligent failure to monitor the Company's compliance with the United States Foreign Corrupt Practices Act (the FCPA), specifically with respect to how its majority-owned joint venture in China, Bristol-Myers Squibb (China) Investment Co. Limited (BMS China), interacted with Chinese healthcare provides. On October 5, 2015, the Securities and Exchange Commission (the SEC) and the Company entered into a consent order that settled these FCPA claims, without admitting wrongdoing, in exchange, inter alia, for $14.7 million. See Dkt. 21 (the Consent Order).
On February 12, 2016, plaintiff made a request under 8 Del C § 220 for the Company's books and records relating to the allegations settled by the Consent Order.[FN3]
level="1"> Plaintiff and the Company entered into a Confidentially and Non-Disclosure Agreement, pursuant to which the Company produced documents to plaintiff in response to his section 220 demand. See Dkt. 24 (the Confidentially Agreement). Paragraph 8 of the Confidentially Agreement provides that the parties consent "to the exclusive jurisdiction of the courts of the State of Delaware for the purpose of any suit, action, or other proceeding arising out of this Agreement." Id. at 4.
By letter dated April 18, 2016, plaintiff demanded that the Board file suit against those at [*3]the Company responsible for the alleged FCPA violations that were settled in the Consent Order. See Dkt. 11. Prior to receiving the Company's response, on August 5, 2016, plaintiff commenced this action by filing his original complaint. See Dkt. 1.[FN4]
By letter dated August 31, 2016, plaintiff was notified that the Board retained counsel and was investigating his demand.
After further correspondence was exchanged, by letter dated December 9, 2016, the Company notified plaintiff that it had refused his demand. See Dkt. 13 at 2. The Company's letter explained that in response to plaintiff's demand, the Board appointed one of its independent members, Dr. Thomas J. Lynch, Jr., to investigate the matters raised by plaintiff's demand. Dr. Lynch retained the Delaware law firm of Morris, Nichols, Arsht & Tunnell LLP (Morris Nichols) to advise the Board. Morris Nichols issued a thorough, 15-page single-spaced report (the Morris Nichols Report) outlining its investigation and its rationale for why it recommended that the Board refuse plaintiff's demand. See id. at 3-17.
The Morris Nichols Report begins by detailing its investigation and how it advised Dr. Lynch:
After it was retained, Morris Nichols began the process of collecting and reviewing thousands of pages of documents pertaining to the matters asserted in the Demand. Morris Nichols, at the direction of Dr. Lynch, also conducted a comprehensive interview of the Company's outside counsel in the FCPA Matter, Gibson, Dunn & Crutcher, LLP ("Gibson Dunn"). During the course of the September 29, 2016 interview, Special Board Counsel inquired regarding the nature of the FCPA issues in China, the existing policies and procedures that were in place at BMS China and that empowered the Company to detect the FCPA compliance issues, the details of the comprehensive investigation of FCPA compliance issues conducted by the Company with the aid of outside counsel and experts, the negotiations with the SEC that resulted in the Order, and the Company's ongoing attention to FCPA issues and improvements in its compliance regime.
Following that interview, the Liaison Director and Morris Nichols met on October 6, 2016 to discuss the status of the investigation. Morris Nichols relayed to Dr. Lynch that the Company and its outside advisors were cooperating with efforts to collect information relevant to the Demand, and shared with him information learned from Gibson Dunn regarding the extensive and comprehensive investigation that the Company had initiated upon discovery of certain FCPA concerns in China (which led, among other things, to the termination of more than ninety employees, discipline of ninety additional employees, and replacing certain BMS China officers), which the Company thereafter voluntarily disclosed to the SEC. Dr. Lynch and Special Board Counsel also exchanged views regarding potential next steps for the investigation, including other persons who [*4]might be interviewed. Morris Nichols reminded Dr. Lynch that the Demand asserted breach of fiduciary duty based on a claim of failure to monitor or failure of oversight, and explained the standard for such a claim under applicable Delaware law. Counsel further reviewed with Dr. Lynch his duty to act on a fully informed basis and to consider the best interests of the Company and all its stockholders when arriving at a recommendation to the Company's Board regarding a response to the Demand. Special Board Counsel and Dr. Lynch also discussed the range of potential responses available to the Board. In addition to the merits of a potential oversight claim, counsel and Dr. Lynch discussed other considerations that could be relevant to Dr. Lynch's recommendation, including potential affirmative defenses, the size of any potential financial recovery, and the direct and indirect costs of any particular action the Board might take in response to the Demand. Specifically, Dr. Lynch and Special Board Counsel discussed the likelihood that the directors of the Company may assert that they are immunized from financial liability for breaches of the duty of care under Section 102(b)(7) of the Delaware General Corporation Law and Article Thirteenth of the Company's Amended and Restated Certificate of Incorporation, and under Section 141(e) of the Delaware General Corporation Law are fully protected by their good faith reliance upon "information, opinions, reports or statements" presented by the Company's officers or employees. Dr. Lynch also considered Section 26 of the Company's Bylaws, which requires the mandatory advancement of defense costs and fees for claims asserted against directors or officers by reason of the fact that they were directors or officers.
On November 1, 2016, Special Board Counsel interviewed the Company's Senior Vice President & Chief Compliance and Ethics Officer regarding matters asserted in the Demand, including the nature of the Company's compliance regime, the nature of the policies and procedures that were in place in China, the FCPA issues that the Company discovered and reported to the SEC, and the Company's efforts to remediate those issues and improve the FCPA compliance regime, both before and after the Order. Special Board Counsel also interviewed the Chair of the Audit Committee of the Company's Board and the former Chair of the Audit Committee regarding, among other things, the role of the Company's internal audit function in testing compliance with applicable law, including the FCPA, and specifically regarding the allegation in the SEC Order regarding reports prepared by internal audit relating to operations in China, as well as the Audit Committee's oversight of compliance, including with respect to FCPA compliance in China. Special Board Counsel also interviewed the Company's Chief Financial Officer regarding compliance issues alleged in the Order, the Company's internal audit and business control function groups, and ongoing efforts by the Company to enhance its compliance regime, including in China.
On November 4, 2016, Dr. Lynch and Special Board Counsel met and engaged in a comprehensive discussion of the matters that had been learned during the course of the interviews that had been conducted, and to exchange views regarding next steps in the investigation. Special Board Counsel again reviewed with Dr. Lynch a director's fiduciary duties, including the standards for a claim for breach of the duty of oversight under applicable Delaware law, the range of potential responses to the Demand available [*5]to the Company's Board, and the considerations relevant to a response, including the merits of a potential claim, possible defenses to the claim, the size of a potential recovery, and the direct and indirect costs of pursuing litigation of the type demanded in the Letter. After comprehensive discussion between Dr. Lynch and Morris Nichols regarding these issues, Dr. Lynch requested Special Board Counsel to consider further whether, based on the investigation to date, there were additional documents to be collected and reviewed, or persons with relevant knowledge to be interviewed, and requested that he be provided with certain documents relevant to his consideration of a recommended response to the Demand.
On November 18, 2016, the Liaison Director and Morris Nichols met to discuss the role of the Company's internal audit function in the Company's compliance efforts, including with respect to FCPA compliance in China. The Liaison Director and Special Board Counsel also reviewed the allegations of the SEC Order, including the claims under the heading regarding red flags, and documents pertaining to the Company's FCPA compliance. The Liaison Director considered the prospects for success on a duty of oversight claim against the individuals named as defendants in the Reese Derivative Complaint, the size of the fine compared to disgorgement and prejudgment interest under the Order, potential defenses to an oversight claim, and the direct and indirect costs to the Company of pursuing a duty of oversight claim. After further discussion and exchange of views regarding factual and legal matters pertaining to the Demand, the Liaison Director requested that Special Board Counsel prepare a draft memorandum for his review describing the investigation that had been conducted, and the various factors Dr. Lynch had considered in arriving at a tentative conclusion regarding an appropriate response to the Demand.
On November 22, 2016, Dr. Lynch and Morris Nichols met again to discuss the draft memorandum Dr. Lynch had requested Special Board Counsel to prepare. Morris Nichols again reviewed with Dr. Lynch the fiduciary duties of directors under Delaware law, applicable legal standards for a breach of the duty of oversight, the size of any potential claim of injury by the Company, potential defenses to a claim, including under Section 102(b)(7) and Section 141(e) of the Delaware General Corporation Law, and the potential direct and indirect costs of pursuing an oversight claim, including the Company's exposure to potential advancement and indemnification expenses. Dr. Lynch and Special Board Counsel also engaged in a page by page review of the draft memorandum, and Dr. Lynch requested that counsel make certain changes and clarifications to the draft. After further discussion and an exchange of views, the Liaison Director determined that he would recommend to the Company's Board that it refuse the demands made in the Letter, and requested that Morris Nichols coordinate with the Company's Corporate Secretary to make the memorandum available for consideration by the full Board in connection with the Board's regularly scheduled meeting on December 8, 2016.
Dkt. 13 at 5-7.
The Morris Nichols Report then addresses the Board's deliberations, which considered [*6]the Company's compliance structure, the efforts the Company made to adhere to its own ethics rules, the specifics of how those rules were applied to BMS China, and how the Company monitored compliance. See id. at 7-13. The Morris Nichols Report then weighed the rules and compliance programs against the allegations made by the SEC in the Consent Order. See id. at 13-15. Finally, the Morris Nichols Report explained why it recommended that the Board refuse plaintiff's demand:
In reaching a conclusion regarding the appropriate recommended response to the Demand, the Liaison Director, with the assistance of Special Board Counsel, expressly considered the potential existence of a claim for failure to monitor or a breach of the duly of oversight. A failure of oversight claim would require the Company to prove that its fiduciaries utterly failed to implement any reporting or information system or controls; or, having implemented such a system or controls, they consciously failed to monitor or oversee the Company's operations and thereby disabled themselves from being informed of risks or problems requiring their attention. To impose liability, the Company would be required to prove that its fiduciaries knew that they were not discharging their fiduciary obligations.
Based upon the policies and procedures the Company had in place and that are described above, and interviews of persons with knowledge of the Company's compliance efforts, as well as the pattern of the Company's proactive efforts to improve its compliance policies and procedures (acknowledged by the SEC in the Order), the Liaison Director concluded there were not viable claims for breaches of fiduciary duty against any of the individuals named in the Reese Derivative Complaint. Although the Order included the heading "failure to respond to red flags," a term used in the context of oversight claims, the SEC's specific allegation was that "BMS China failed to respond effectively" to the matters identified by the SEC. [Consent] Order ¶ 5(emphasis added). The three paragraphs that follow the heading are limited to actions of BMS China personnel, and there is no allegation that the matters came before the members of the Company's Board whom Mr. Reese demands that the Company sue. Moreover, applicable Delaware law does not impose liability on fiduciaries for a failure to respond effectively; rather, there must be an utter failure and a showing that the Company's directors "knew" that they were not discharging their obligations. As to the results of the Internal Audit reports provided to the Audit Committee and senior management regarding BMS China, the Order does not allege that they constituted "red flags" but that they were in fact a part of the Company's compliance and controls environment. The investigation revealed that the Internal Audit function is well regarded, that as to BMS China its focus shifted to different business areas and subjects of risk over time, and that any exceptions that were identified also included a specific plan for remediation, along with persons who were responsible for the remediation and a timeframe for completion. The attention of Internal Audit to such matters is not indicative of a knowing failure by the Company's fiduciaries to discharge their oversight duties. To the contrary, it shows that the directors took their oversight duties seriously by making sure the Company routinely tested compliance with its own policies. The Company and BMS China implemented substantial remedial measures, described above, to minimize the risk of noncompliance with the FCPA. As of [*7]May 2015, the Internal Audit function concluded that BMS China's interactions with HCPs had improved to a level of satisfactory. The investigation did not find evidence to support a conclusion that the directors knew they were not discharging their fiduciary obligations, but instead established that the Board, the Audit Committee, and management emphasize legal compliance. The directors' commitment with respect to compliance, moreover, was reflected in the Compensation Committee's decision to exercise negative discretion over the bonus compensation awards to the Company's chief executive officer, other named executive officers, and other executive officers in connection with the Company's civil settlement with the SEC of alleged FCPA violations. Given all of these facts, there is not a meritorious claim that any of the defendants named in the Reese Derivative Complaint knew that they were not discharging their fiduciary oversight function.
Dkt. 13 at 15-16 (emphasis added).
Morris Nichols, critically, did not merely assess the merits of plaintiff's proposed claims. Rather, as one would expect of sophisticated counsel, it analyzed whether taking action would be in the best interest of Company:
In addition to considering the potential size of a monetary recovery and the terms of the Company's insurance policy for its directors and officers, the Liaison Director considered potential defenses (other than on the merits) that the defendants in the Reese Derivative Action would have to a claim that they breached their fiduciary duty of oversight. In addition to the immunity from liability for breaches of the duty of care provided to directors by Section 102(b)(7) of the Delaware General Corporation Law and Article Thirteenth of the Company's Amended and Restated Certificate of Incorporation, the members of the Audit Committee were advised repeatedly by qualified Company personnel that the Company had an effective FCPA compliance program, and the Board as a whole also regularly considered compliance in China and elsewhere such that the directors would, under Section 141(e) of the Delaware General Corporation Law, be immune from monetary liability for their good faith reliance on reports provided by the Company's well-qualified employees. The Liaison Director also considered, to the extent the Demand complains of alleged wrongdoing substantially predating the Order, that directors might assert a statute of limitations defense.
Recognizing that it is "within the bounds of business judgment to conclude that a lawsuit, even if legitimate, would be excessively costly to the corporation or harm its long-term strategic interests,"[citation omitted] the Liaison Director also considered the prospect that the Company's officers and directors would be entitled to advancement of their defense costs, as well as the prospect that they would be entitled to indemnification from the Company under applicable Delaware law and the Company's Bylaws. The Liaison Director further considered the costs to, and detrimental effects on, the Company of pursuing such litigation, which would distract the Company's current directors and officers from performing the jobs the Board believes they should be performing, and that such a lawsuit could adversely affect the Company's relationships with its employees and customers, and adversely affect the Company's business and prospects.
After concluding his investigation and with the assistance of independent counsel experienced in considering stockholder demands, the Liaison Director recommends that the Company's Board refuse to bring claims for breach of the fiduciary duty of oversight demanded in the Letter. In reaching this recommendation, the Liaison Director observed that the Company has long had policies in place regarding compliance with the FCPA, and that the Company's directors and senior management have acted to remediate issues of noncompliance (with aspects of that remediation specifically acknowledged by the SEC). These observations are entirely inconsistent with the "utter failure" that is required for a duly of oversight claim under Delaware law, and inconsistent with a conclusion that the directors knew that they were not performing their duties. As such, there is not a viable claim for breach of fiduciary duty. Apart from the merits of any potential claim, the Liaison Director also considered the size of a potential recovery balanced against defenses that could be interposed by directors, including the statute of limitations, and immunity from liability under the Sections 102(b)(7) and 141(e) of the Delaware General Corporation Law. The Liaison Director also considered the potential costs of pursuing a claim for breach of the duty of oversight, and the Company's obligation to advance defense costs and its potential exposure to claims for indemnification. Finally, the Liaison Director also considered the indirect costs of pursuing a claim for breach of fiduciary duty, including the detrimental effects such an action would have on morale and the Company's relationships with its customers and the public. Because each of these considerations counsels against instituting litigation for breach of the duty of oversight against the directors that is sought in the Demand, the Liaison Director recommends that the Board refuse it.
Dkt. 13 at 16-17 (emphasis added). As noted earlier, the Board accepted Morris Nichols' recommendation and notified plaintiff that it refused his demand. See id. at 2.
After receiving the Morris Nichols Report, on February 8, 2017, plaintiff filed the AC, which asserts three causes of action: (1) breach of fiduciary duty (i.e., a Caremark claim); (2) breach of fiduciary duty for wrongfully refusing plaintiff's demand; and (3) unjust enrichment. See Dkt. 9. On March 10, 2017, defendants filed the instant motion to dismiss the AC. They argue that: (1) paragraph 8 of the Confidentially Agreement obligated plaintiff to file this action in Delaware; (2) plaintiff has not pleaded wrongful demand refusal; and (3) plaintiff has not stated a Caremark claim or a cause of action for unjust enrichment. The court reserved on the motion after oral argument. See Dkt. 33 (8/10/17 Tr.).
Below, the court dismisses the AC because plaintiff has not, under governing Delaware law, met his extremely high burden of pleading that the Board's refusal of his demand was wrongful. The court does not reach defendants' forum argument since, presumably, they would rather this court dismiss this action for failure to plead wrongful demand refusal than kick the can to Delaware for another round of litigation. Moreover, the court's demand refusal holding obviates the need to assess whether plaintiff has pleaded Caremark or unjust enrichment claims; failure to plead wrongful demand refusal defeats plaintiff's standing to prosecute these derivative claims.
II. Legal Standard
A. Motion to Dismiss
On a motion to dismiss, the court must accept as true the facts alleged in the complaint as well as all reasonable inferences that may be gleaned from those facts. Amaro v Gani Realty Corp., 60 AD3d 491 (1st Dept 2009); Skillgames, LLC v Brody, 1 AD3d 247, 250 (1st Dept 2003), citing McGill v Parker, 179 AD2d 98, 105 (1st Dept 1992); see also Cron v Hargro Fabrics, Inc., 91 NY2d 362, 366 (1998). The court is not permitted to assess the merits of the complaint or any of its factual allegations, but may only determine if, assuming the truth of the facts alleged and the inferences that can be drawn from them, the complaint states the elements of a legally cognizable cause of action. Skillgames, id., citing Guggenheimer v Ginzburg, 43 NY2d 268, 275 (1977). Deficiencies in the complaint may be remedied by affidavits submitted by the plaintiff. Amaro, 60 NY3d at 491. "However, factual allegations that do not state a viable cause of action, that consist of bare legal conclusions, or that are inherently incredible or clearly contradicted by documentary evidence are not entitled to such consideration." Skillgames, 1 AD3d at 250, citing Caniglia v Chicago Tribune-New York News Syndicate, 204 AD2d 233 (1st Dept 1994). Further, where the defendant seeks to dismiss the complaint based upon documentary evidence, the motion will succeed if "the documentary evidence utterly refutes plaintiff's factual allegations, conclusively establishing a defense as a matter of law." Goshen v Mutual Life Ins. Co. of NY, 98 NY2d 314, 326 (2002) (citation omitted); Leon v Martinez, 84 NY2d 83, 88 (1994).
B. Demand Refusal
The parties agree that Delaware law applies. See Lerner v Prince, 119 AD3d 122, 128-29 (1st Dept 2014). Under Delaware law, it is well settled that:
The decision to bring litigation on behalf of a corporation is a quintessential exercise of business judgment, involving as it does a complex array of costs (both monetary and otherwise), potential benefits, and the risk of uncertain outcomes. Under our model of corporate governance, then, the decision to pursue litigation on behalf of the entity is entrusted to the directors, who must approach that decision in light of their fiduciary duties. Only where the directors will not or cannot act in a manner consistent with those duties, may stockholders pursue such litigation derivatively, on behalf of the corporation.
Ironworkers Dist. Council of Philadelphia & Vicinity Ret. & Pension Plan v Andreotti, 2015 WL 2270673, at *25 (Del Ch 2015) (Ironworkers), aff'd sub nom. Ironworkers Dist. Council of Philadelphia v Andreotti, 132 A3d 748 (Del 2016). It is equally well settled that a stockholder may not maintain a derivative action without first making a demand on the board or pleading that it would be futile to do so. Rales v Blasband, 634 A2d 927, 933 (Del 1993); In re Duke Energy Corp. Deriv. Lit., 2016 WL 4543788, at *14 (Del Ch 2016). Unlike the Deckter action, where no demand was made and this court dismissed the case for failure to plead demand futility, here, plaintiff made a demand on the Board. That demand was refused.
The implications of the Board's refusal also are well settled. "By making a demand, a stockholder tacitly acknowledges the absence of facts to support a finding of [demand] futility." Spiegel v Buntrock, 571 A2d 767, 775 (Del 1990). "Thus, when a demand is made, the question of whether demand was excused is moot." Id. "Consequently, stockholders who make a demand which is refused[] subject the board's decision to judicial review according to the traditional business judgment rule." Id. at 775-76; see Andersen v Mattel, Inc., 2017 WL [*8]218913, at *3 (Del Ch 2017). "[T]o have standing to sue derivatively, under Court of Chancery Rule 23.1 [the stockholder] must allege with particularity facts that raise a reasonable doubt that in refusing the demand the directors complied with their fiduciary duties." Ironworkers, 2015 WL 2270673, at *2.
"Accordingly, for the Court, "the only issues to be examined are the good faith and reasonableness of [the Board's] investigation." Id. at *24 (emphasis added; citation and quotation marks omitted). "Stated otherwise, to survive a motion to dismiss under Rule 23.1 where demand has been made and refused, a plaintiff must allege particularized facts that raise a reasonable doubt that (1) the board's decision to deny the demand was consistent with its duty of care to act on an informed basis, that is, was not grossly negligent; or (2) the board acted in good faith, consistent with its duty of loyalty." Id. (emphasis added). "Otherwise, the decision of the board is entitled to deference as a valid exercise of its business judgment." Id. "[T]he 'pertinent 'reason to doubt' is not doubt about the propriety of the underlying conduct, nor is it doubt about whether the Board, in rejecting the demand, made a wise decision; it is doubt whether the Board's action, wise or foolish, was taken in good faith and absent gross negligence.'" Zucker v Hassell, 2016 WL 7011351, at *7 (Del Ch 2016), aff'd 165 A3d 288 (Del 2017), quoting Ironworkers, 2015 WL 2270673, at *26. "[M]ere disagreement with the Committee's ultimate conclusion, as well as its subsidiary conclusions leading thereto, will be insufficient to raise a reasonable doubt that the Board acted in good faith and on an informed basis." Ironworkers, 2015 WL 2270673, at *27.
III. Discussion
The allegations in the AC do not permit a reasonable inference that, in relying on the Morris Nichols Report in deciding to reject plaintiff's demand, the Board's decision was grossly negligent or made in bad faith.
As an initial matter, and as noted above, plaintiff cannot argue that members of the Board were conflicted. By making a demand, plaintiff has conceded that the Board can fairly assess his claims. Spiegel, 571 A2d at 775 ("A shareholder who makes a demand can no longer argue that demand is excused."); see Rich v Yu Kwai Chong, 66 A3d 963, 976 (Del Ch 2013) ("By making a litigation demand on a board of directors, a stockholder concedes that the board is able to evaluate the demand, free from concerns of conflicts of interest or lack of independence."). In that regard, plaintiff's attempt to impugn the propriety of the Board's reliance on Dr. Lynch and Morris Nichols in lieu of appointing a special litigation committee is unavailing. The rules of when deference to such a committee apply are not relevant here. The Board, which the court must assume to not have been conflicted, was entitled to consult with whoever it saw fit, in its business judgment, to advise it on the merits of plaintiff's claims.[FN5]

There also is no merit in plaintiff's contention that he needs discovery to assess the reasonableness of the Board's rejection of his demand. The First Department has expressly held that, where Delaware law applies, a plaintiff is not entitled to discovery to aid in pleading a [*9]claim for wrongful demand refusal. See Lerner, 119 AD3d at 129 ("allowing plaintiff to proceed with discovery would thwart the purposes underlying Delaware's law on demand refusal—specifically, its recognition that deciding whether to pursue litigation is a decision entitled to deference under the business judgment rule."). Indeed, the First Department held that even in a derivative action governed by New York law, "plaintiff would not be entitled to discovery in [a] demand-refused case." Id.; see id. at 130 ("the purpose of discovery is to find out additional facts about a well-pleaded claim, not to find out whether such a claim exists.") (citation omitted).
The only other argument proffered by plaintiff is that "defendants have not demonstrated the reasonableness of the [Board's] Investigation." See Dkt. 26 at 18 (capitalization and emphasis omitted). In framing its argument in this manner, plaintiff reverses the applicable burden. As discussed, to survive a motion to dismiss, it is plaintiff's burden to plead facts that permit a reasonable inference that the Board's investigation was either grossly negligent or made in bad faith. The Company need not demonstrate anything other than plaintiff's failure to plead gross negligence or bad faith.
Here, at best, plaintiff has identified further steps that Morris Nichols could have taken in its investigation. These alleged inadequacies (e.g., that additional witnesses should have been interviewed), even assuming them to have merit, merely raise the possibility that Morris Nichols conducted a negligent investigation. That is not enough.
Regardless, while plaintiff takes issue with the investigation, plaintiff's brief is notably silent on Morris Nichols' analysis of whether — given the extreme difficulty in pleading a Caremark claim that could survive a motion to dismiss — it is in the Company's best interest to pursue such a claim in light of the financial and reputational costs necessarily incurred by filing suit. This, alone, is fatal. The Company successfully settled with the FCPA for merely $14.7 million without having to admit guilt (for acts committed at a time when its stock price increased). It has apparently improved its FCPA compliance. Leaving aside the financial costs of litigation, there are political perils of publicly litigating corruption in China that pose real risk to the Company and its shareholders. Suffice it to say that in a quest to recoup a $14.7 million fine, the Company could end up losing far more money. A reasonable board of directors is well within its rights to conclude that doing so is not in the best interest of the Company or its shareholders.
Moreover, even if the court were to conclude that reasonable minds could disagree with the Board's conclusion, disagreement about such questions of business judgment requires deference to the Board. Neither plaintiff nor the court is permitted to second-guess the Board's decision. Plaintiff has not proffered any basis for the court to conclude that, under these circumstances, no reasonable board would forgo the opportunity to file suit or that the Board's decision not to do so was actually made in bad faith.[FN6]
On the contrary, as Morris Nichols' [*10]persuasively advised (and as further evidenced by the Company's strong arguments concerning the pleading deficiencies in plaintiff's Caremark claim),[FN7]
it was reasonable for the Board to conclude that refusing plaintiff's demand was in the Company's best interest. Accordingly, it is
ORDERED that defendants' motion to dismiss is granted, and the Clerk is directed to enter judgment dismissing the Amended Complaint with prejudice.
Dated: October 18, 2017
ENTER:
__________________________
J.S.C.



Footnotes

Footnote 1:References to "Dkt." followed by a number refer to documents filed in this action on the New York State Courts Electronic Filing system (NYSCEF).

Footnote 2:This type of claim "charges the director defendants with breach of their duty of attention or care in connection with the on-going operation of the corporation's business." In re Caremark Int'l Inc. Deriv. Lit., 698 A2d 959, 967 (Del Ch 1996). "The claim is that the directors allowed a situation to develop and continue which exposed the corporation to enormous legal liability and that in so doing they violated a duty to be active monitors of corporate performance." Id. Delaware courts consider a Caremark claim as "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." Id.; see Stone v Ritter, 911 A2d 362, 365 (Del 2006) ("we hold that Caremark articulates the necessary conditions for assessing director oversight liability."). "At the pleadings stage, a plaintiff must allege particularized facts that satisfy one of the necessary conditions for director oversight liability articulated in Caremark: either that (1) 'the directors utterly failed to implement any reporting or information system or controls'; or (2) 'having implemented such a system or controls, [the directors] consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention.'" Horman v Abney, 2017 WL 242571, at *7 (Del Ch 2017), quoting Stone, 911 A2d at 370. This is difficult to do because "a plaintiff must plead facts that allow a reasonable inference that the directors acted with scienter which, in turn, requires [not only] proof that a director acted inconsistently with his fiduciary duties, but also most importantly, that the director knew he was so acting." Id. (citation and quotation marks omitted; emphasis in original).

Footnote 3:See In re Wal-Mart Stores, Inc. Del. Deriv. Lit., 2017 WL 3138201, at *1 (Del Ch 2017) ("Delaware courts have long encouraged stockholders contemplating derivative actions to use the 'tools at hand'—in particular to obtain corporate books and records under Section 220 of the Delaware General Corporation Law—before filing derivative litigation so that the issue of demand futility may be decided on a well-developed factual record."), quoting Seinfeld v Verizon Commc'ns, Inc., 909 A2d 117, 120 (Del 2006).

Footnote 4:Nearly a year earlier, in December 2015, two other stockholders filed derivative actions against the Company in New York County's Commercial Division concerning the Company's FCPA compliance. The first action was voluntarily discontinued while a motion to dismiss was sub judice before Justice Scarpulla. See Leslie v Caforio, Index No. 162849/2015. By order dated April 4, 2017, the second action was dismissed by this court due to the plaintiff's failure to plead demand futility. See Deckter v Andreotti, Index No. 654390/2015, Dkt. 35 (order) & Dkt. 37 (4/4/17 Tr.).

Footnote 5:It should be noted that there is no concern that the board improperly delegated its decision to consider plaintiff's demand. See Obeid v Hogan, 2016 WL 3356851, at *15 (Del Ch 2016). The Board itself made the decision with the aid of outside counsel (i.e., Dr. Lynch did not make a unilateral decision). Plaintiff cites no authority that suggests doing so was improper.

Footnote 6:Again, plaintiff cannot claim the Board's decision was made in order to insulate its members from liability because, by making a demand on the Board, plaintiff has forfeited that argument (which, in any event, has no support in the record and was rejected by this court in Deckter). Hence, the court must assume the Board's judgment was not tainted by the individual board members' personal self-interest. With that caveat, there is nothing whatsoever in the record to suggest bad faith.

Footnote 7:A detailed Caremark analysis is not necessary given plaintiff's failure to state a claim for bad faith demand refusal.