# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CITY OF TAMARAC FIREFIGHTERS' PENSION TRUST FUND, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2017-0341-KSJM |
| CAROLYN CORVI, JANE C. GARVEY, BARNEY HARFORD, TODD M. INSLER, WALTER ISAACSON, JAMES A.C. KENNEDY III, OSCAR MUNOZ, ROBERT A. MILTON, WILLIAM R. NUTI, SITO PANTOJA, EDWARD M. PHILIP, EDWARD L. SHAPIRO, LAURENCE E. SIMMONS, JEFFERY A. SMISEK, DAVID J. VITALE, and JAMES M. WHITEHURST, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| UNITED CONTINENTAL HOLDINGS, INC., a Delaware Corporation, | ) ) ) ) | |
| Nominal Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: November 14, 2018
Date Decided: February 12, 2019

Carmella P. Keener, Jessica Zeldin, ROSENTHAL, MONHAIT & GODDESS, P.A. Wilmington, Delaware; Gustavo F. Bruckner, POMERANTZ LLP, New York, New York; *Attorneys for Plaintiff City of Tamarac Firefighters' Pension and Trust Fund.*

Gregory P. Williams, Robert L. Burns, Anthony M. Calvano, RICHARDS LAYTON & FINGER, P.A., Wilmington, Delaware; Craig C. Martin, Matt D. Basil, Howard S. Suskin, JENNER & BLOCK LLP, Chicago, Illinois; *Attorneys for Defendants Carolyn Corvi, Jane C. Garvey, Barney Harford, Todd M. Insler, Walter Isaacson, James A.C. Kennedy III, Oscar Munoz, Robert A. Milton, William R. Nuti, Sito Pantoja, Edward M. Philip, Edward L. Shapiro, Laurence E. Simmons, David J. Vitale, and James M. Whitehurst.*

Arthur G. Connolly, Ryan P. Newell, Kyle Evans Gay, Shaun Michael Kelly, CONNOLLY GALLAGHER, Wilmington, Delaware; Royal B. Martin, William G. Sullivan, Giel Stein, CLARK HILL, PLC, Chicago, Illinois; *Attorneys for Defendant Jeffery A. Smisek.*

David E. Ross, R. Garrett Rice, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; *Attorney for Nominal Defendant United Continental Holdings, Inc.*


**McCORMICK, V.C.**

In 2011, then-chairman of the Port Authority of New York and New Jersey, David Samson, wanted to "fly friendly skies" direct from Newark, New Jersey to Columbia, South Carolina, where he owned a vacation home. Samson proposed to Jeffery A. Smisek, then-chief executive officer of United Continental Holdings, Inc. ("United"), that Smisek re-institute a Newark-to-Columbia route, which historically operated at a loss. Smisek agreed, but in exchange for Samson's approval of development projects at United Airline's regional hub. The flights took off, at least for a time. In 2014, a federal investigation into an unrelated Port Authority scandal uncovered facts concerning Samson's "chairman's flight." Multiple federal investigations of United ensued.

In the midst of the federal investigations, Smisek and United entered into a separation agreement that provided Smisek with approximately $37 million in benefits. A special committee of outside directors advised by outside counsel negotiated and approved the separation agreement.

A stockholder made two litigation demands asking the United board to claw back the separation compensation or rescind the separation agreement. The board rejected both demands, and the stockholder filed this derivative suit. The defendants have moved to dismiss the complaint.

When a plaintiff makes a pre-suit litigation demand, the plaintiff's complaint can only survive a motion to dismiss under Court of Chancery Rule 23.1 by pleading

1

that the directors wrongfully refused the demand. In this case, the complaint fails to plead particularized facts raising a reasonable doubt that the defendants acted with due care and in good faith in rejecting the demand.

This case presents one twist on the usual demand-refusal analysis. By making a pre-suit litigation demand, a plaintiff "tacitly concedes" that the board is disinterested and independent for purposes of responding to the demand.[1] In this case, the board did not consider the demand. The board instead delegated the issue to a special committee. The plaintiff argues that the board was grossly negligent in delegating the issue to the special committee because its members were incapable of acting disinterestedly and independently on the demand. The defendants respond that the Court may not consider the alleged conflicts because the tacit concession extends to the members of the special committee.

Extending the tacit concession to the members of the special committee conflicts with the Delaware Supreme Court's decision in *Scattered Corp. v. Chicago Stock Exchange, Inc.*[2] This decision thus evaluates the plaintiff's allegations of

---

[1] *Spiegel v. Buntrock*, 571 A.2d 767, 777 (Del. 1990).

[2] *Scattered Corp. v. Chi. Stock Exch., Inc.*, 701 A.2d 70 (Del. 1997) [hereinafter *Scattered III*]. In *Brehm v. Eisner*, 746 A.2d 244, 253–54 (Del. 2000), the Delaware Supreme Court overruled seven precedents, including *Scattered III*, to the extent those precedents reviewed a Rule 23.1 decision by the Court of Chancery under an abuse of discretion standard or otherwise suggested a deferential appellate review. *See id.* at 253 & n.13 (overruling in part on this issue *Scattered III*, 701 A.2d at 72–73 (Del. 1997); *Grimes v. Donald*, 673 A.2d 1207, 1217 n.15 (Del. 1996); *Heineman v. Datapoint Corp.*, 611 A.2d 950, 952 (Del. 1992); *Levine v. Smith*, 591 A.2d 194, 207 (Del. 1991); *Grobow v. Perot*, 539 A.2d 180,

conflicts at the committee level to determine whether the board acted with gross negligence when delegating the issue to the special committee. The defendants prevail nevertheless, because the complaint does not allege disabling conflicts with sufficient particularity.

The plaintiff also asserts a waste claim against the director defendants and an unjust enrichment claim against Smisek. The act of making a pre-suit litigation demand bars a plaintiff from pursuing derivative litigation involving subject matter of the demand, regardless of the legal theory, unless the plaintiff can show wrongful refusal. Because the plaintiff's waste and unjust enrichment claims arise from the subject matter of the demand, they too are subject to the demand refusal analysis.

## I. FACTUAL BACKGROUND

The background facts are drawn from the particularized allegations of the Verified Amended Stockholder Derivative Complaint (the "Amended Complaint")

---

186 (Del. 1988); *Pogostin v. Rice*, 480 A.2d 619, 624–25 (Del. 1984); and *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984)). The *Brehm* Court held that going forward, appellate review of a Rule 23.1 determination would be *de novo* and plenary. 746 A.2d at 253-54. The seven partially overruled precedents otherwise remain good law. This decision does not rely on any of them for the standard of appellate review. Although the technical rules of legal citation would require noting that each was reversed on other grounds by *Brehm*, this decision omits the subsequent history, which creates the misimpression that *Brehm* rejected core elements of the Rule 23.1 canon.

and documents incorporated therein. The decision also considers the correspondence refusing the plaintiff's litigation demands.[3]

### A. The Federal Investigations

Nominal Defendant United is a publicly traded airline holding company that owns and operates United Airlines.[4]

In September 2011, Samson was chairman of the Port Authority of New York and New Jersey. Smisek was United's CEO. Over dinner in Manhattan, Samson asked Smisek to revive United Airlines' discontinued Newark-to-Columbia route, which would ease Samson's commute to his South Carolina vacation home.[5] After Smisek agreed to reinstate the route, the Port Authority approved United's projects at Newark International Airport.[6] United operated the Newark-to-Columbia route twice a week for nineteen months. It generated losses for United of approximately $945,000.[7]

---

[3] *See Scattered III*, 701 A.2d at 76 n.24; *Levine*, 591 A.2d at 214; *see also* 4 Stephen A. Radin, *The Business Judgment Rule* 4495 (6th ed. 2009).

[4] *See* C.A. No. 2017-0341-KSJM Docket ("Dkt.") 30, Amended Complaint ("Am. Compl.") ¶ 3.

[5] *Id.* ¶ 42.

[6] *Id.* ¶ 44.

[7] *Id.* ¶ 43.

A federal investigation into an unrelated 2013 Port Authority scandal uncovered the interactions between Smisek and Samson. Multiple federal agencies responded by commencing investigations.

On January 22, 2015, and February 17, 2015, United received grand jury subpoenas from the Office of the United States Attorney for the District of New Jersey (the "U.S. Attorney's Office").[8] On September 9, 2015, United received a subpoena from the Securities Exchange Commission ("SEC") covering similar topics. United also received information requests from the General Services Administration and the Office of Inspector General for the Port Authority.

## B. The Special Committee

On March 2, 2015, United's Board of Directors (the "Board") established a special committee of nine independent and disinterested directors (the "Special Committee").[9] The Board resolution broadly empowered the Special Committee to oversee United's response to the federal subpoenas and manage United's internal investigation into any potential misconduct.[10] The resolution "gave the Special

---

[8] *Id.* ¶ 44 & Ex. A at 1.

[9] The initial nine Special Committee members were Defendants Carolyn Corvi, Walter Isaacson, Oscar Munoz, William R. Nuti, Laurence E. Simmons, David J. Vitale, and non-parties Henry L. Meyer III, John H. Walker, and Charles A. Yamarone. Am. Compl. ¶ 6 n.7.

[10] *Id*. Ex. A at 1.

Committee the authority to act on behalf of the Board and to enter into any agreement with federal, state, and local authorities."[11]

The Special Committee retained Jenner & Block LLP ("Jenner") to provide counsel concerning both United's subpoena responses and the Special Committee's investigation.[12]

### C. The Separation Agreements

On September 8, 2015, the Special Committee approved a separation agreement between United and Smisek.[13] Pursuant to the separation agreement, Smisek received benefits contemplated in his employment agreement, including a separation payment of $4,875,000, accrued stock and awards, flight benefits, and lifetime airport parking spots.[14] The Amended Complaint values the benefits conferred by the separation agreement at approximately $37 million.[15] The Special Committee also approved separation agreements with two other United executives (with Smisek's separation agreement, the "Separation Agreements").[16]

---

[11] *Id.* ¶ 6 n.7.

[12] *Id.* Ex. A at 1.

[13] Am. Compl. ¶ 47 & Ex. B ("Smisek Separation Agr.").

[14] Smisek Separation Agr. § 3(a), (b)–(f), (h)–(i). *Compare id. with* United Cont'l Hldgs., Inc., Annual Report (Form 10-K), ex. 10.21 (Feb. 22, 2011) (Smisek employment agreement) §§ 3.7(iii)(2), 4.1(B), 4.2(A), (B).

[15] Am. Compl. ¶ 47.

[16] Am. Compl. ¶ 50 & Ex. A at 2.

The Separation Agreements permit United to claw back separation benefits if the executive fails to cooperate with the defense or investigation of certain claims, or if the executive pleads guilty to or is convicted of a felony arising from his tenure at United (the "Clawback Provisions").[17]

## D. The Fall-Out from the Federal Investigations

On July 13, 2016, United entered into a non-prosecution agreement with the U.S. Attorney's Office.[18] Under the non-prosecution agreement, United agreed to pay a $2,250,000 fine and take other remedial steps.[19]

The next day, Samson agreed to plead guilty to bribery for using his official authority to pressure United into restoring the Newark-to-Columbia route for his personal benefit.[20] Samson was sentenced to one year of home confinement and four years of probation.[21] He was also ordered to pay a fine of $100,000.[22]

On December 2, 2016, the SEC accepted United's Offer of Settlement, in which United agreed it had committed books and records and internal controls

---

[17] *See, e.g.*, Smisek Separation Agr. §§ 10, 11.

[18] Am. Compl. Ex. A at 2.

[19] *Id*. ("[The] [n]on-prosecution [a]greement with the USAO . . . provided that United pay a $2,250,000 monetary penalty and comply with certain undertakings, such as making enhancements to United's Ethics and Compliance program.").

[20] *Id*. ¶ 41.

[21] *Id*.

[22] *Id*.

violations under SEC regulations. The settlement required United to pay a penalty of $2,400,000.[23]

### E.    The Initial Demand

Plaintiff City of Tamarac Firefighters' Pension Trust Fund ("Plaintiff") alleges that it held United common stock at all relevant times.[24]

With information gathered by using 8 *Del. C.* § 220,[25] Plaintiff sent a litigation demand to the Board on October 7, 2016 (the "Initial Demand").[26]   The Initial Demand requested that United claw back compensation from Smisek and the other two United executives.[27]   It further requested that United modify its clawback policies and future employment agreements to include provisions "granting the Board discretion to recoup compensation whenever the Board determines misconduct, willful or otherwise, has occurred."[28]

Although Plaintiff addressed its Initial Demand to the Board, the Board delegated consideration of the Initial Demand to the Special Committee.  Before the Initial Demand, the Board replaced four of the nine original Special Committee

---

[23] *Id.* ¶ 53.

[24] *Id.* ¶ 13.

[25] *Id.* ¶¶ 55–58.

[26] *Id.* Ex. D.

[27] *Id.* Ex. D at 2–3.

[28] *Id.* Ex. D at 3.

members and added a tenth member.[29]  Five of the ten committee members considering the Initial Demand, therefore, had also negotiated and approved the Separation Agreements.  The Special Committee sought advice from its existing counsel, Jenner, in responding to the Initial Demand.

The Special Committee rejected the Initial Demand in a letter from Jenner dated March 24, 2017.[30]  The letter explained in detail the nature of the Special Committee's investigation:

> [T]o date, we have collected materials from approximately 50 custodians, and we reviewed approximately 7.5 million pages of materials.  In addition to our substantial document collection and review, we conducted approximately 240 witness interviews of both former and current Company employees.  In addition, we have met in person with the various government agencies on numerous occasions . . . .[31]

The letter reported that the Special Committee met on March 14, 2017, to consider the Initial Demand and that its members unanimously decided to decline to take action in response to the demand.[32]

---

[29] On September 8, 2015, contemporaneous with United's execution of Smisek's separation agreement, Munoz left the Special Committee to replace Smisek as CEO.  Am. Compl. ¶ 6 n.7, ¶ 20.  On June 8, 2016, Meyer, Walker, and Yamarone retired from the Board, and the Board appointed Defendants Barney Harford, James A.C. Kennedy III, Robert A. Milton, Edward L. Shapiro, and James M. Whitehurst to the Special Committee. *Id*. ¶ 6 n.7.

[30] *Id*. Ex. A.

[31] *Id*. Ex. A at 2.

[32] *Id.* Ex. A at 3.

Because the circumstances under which United could exercise its clawback rights under the Separation Agreements had not occurred, the letter stated: "Should any of the circumstances described in the [Clawback Provisions] arise, the Special Committee may consider suitable action at that time."[33]

The letter also rejected Plaintiff's demand that United modify its clawback policies and claw back any compensation paid to any executive involved in certain actions, explaining that such a modification "is inconsistent with prevailing industry practice."[34] The letter observed that "[s]imilarly-situated companies do not confer upon their boards" the level of discretion sought by the Initial Demand, and such a modification "would make it difficult for United to recruit and retain top talent[.]"[35]

The letter further explained: "Among the Special Committee's considerations were the concern of disruption to or distraction from the business, the efficacy of the requested action, and the actions United has already taken on its own initiative as a result of its investigation and in response to these events and government resolutions."[36]

---

[33] *Id.* Ex. A at 4.

[34] *Id.* Ex. A at 3.

[35] *Id.* Ex. A at 4.

[36] *Id.*

10

### F. The Supplemental Demand

Plaintiff commenced this litigation on May 4, 2017.[37] Plaintiff named as defendants Smisek and each of the fifteen directors who served on the Board at the time Plaintiff commenced litigation (collectively, the "Director Defendants" and with Smisek, "Defendants").[38]

After Defendants moved to dismiss the initial complaint, Plaintiff sent another demand letter on September 15, 2017 (the "Supplemental Demand").[39] Like the Initial Demand, Plaintiff addressed the Supplemental Demand to the Board. The Supplemental Demand repeated the prior list of demands and added a request that the Board institute legal action to rescind Smisek's separation agreement.[40]

After receiving the Supplemental Demand, the Special Committee formed a subcommittee comprising five of its members who were not on the Special Committee (or the Board) when the Separation Agreements were approved.[41] The

---

[37] Dkt. 1.

[38] Am. Compl. ¶¶ 14–29. The Director Defendants are Corvi, Garvey, Harford, Insler, Isaacson, Kennedy, Munoz, Milton, Nuti, Pantoja, Philip, Shapiro, Simmons, Vitale, and Whitehurst. *Id.*

[39] *Id*. Ex. E.

[40] *Id.* Ex. E at 1.

[41] The Subcommittee members are Harford, Kennedy, Milton, Shapiro, and Whitehurst. *Id.* Ex. C at 2.

Subcommittee did not retain new counsel; it received advice from Jenner concerning the Supplemental Demand.[42]

The Subcommittee met on December 20, 2017, and unanimously declined to take any action in response to the Supplemental Demand.[43] Jenner explained in a letter to Plaintiff dated December 31, 2017, that the Subcommittee considered "the findings and outcomes of the internal and government investigations, the likelihood that United could successfully rescind or otherwise reverse the [S]eparation [A]greements, concern of disruption to or distraction from the business, and the other actions United took as a result of its investigation and in response to these events and government resolutions."[44] The letter further stated that if the conditions for invoking the Clawback Provisions arose, "the Special Committee or Subcommittee, as appropriate, may consider suitable action."[45]

Plaintiff filed the Amended Complaint on February 12, 2018.[46] Defendants renewed their motions to dismiss.[47] The parties presented oral arguments to the Court on November 14, 2018.[48]

---

[42] *See generally id.* Ex. C.

[43] *Id.* Ex. C at 2.

[44] *Id.* Ex. C at 2–3.

[45] *Id.* Ex. C at 3.

[46] Dkt. 30.

[47] Dkt. 36, 39.

[48] Dkt. 66, 67.

## II.    LEGAL ANALYSIS

Defendants have moved to dismiss the Amended Complaint, which has three Counts:  Count I for breach of fiduciary duties, Count II for waste, and Count III for unjust enrichment.  Each Count is derivative in nature and thus subject to Court of Chancery Rule 23.1.[49]

### A.    Count I: Wrongful Demand Refusal

Rule 23.1 derives from the bedrock principle that directors, rather than stockholders, manage the business and affairs of the corporation.[50]  Their authority includes decisions to pursue or refrain from pursuing litigation on behalf of the corporation.[51]  As part of this board-centric model, Rule 23.1 requires that a stockholder wishing to bring a derivative action first demand that the board of directors take action.[52]  If a plaintiff chooses not to make a demand, the stockholder must plead with particularity why it would have been futile to present the matter to the board.[53]

---

[49] Ct. Ch. R. 23.1

[50] 8 *Del. C.* § 141(a).

[51] *Spiegel*, 571 A.2d at 772–73; *Aronson*, 473 A.2d at 811–12.

[52] Ct. Ch. R. 23.1; *see also Spiegel*, 571 A.2d at 773.

[53] Ct. Ch. R. 23.1; *see also Spiegel*, 571 A.2d at 774; *Klein v. H.I.G. Capital, L.L.C.*, 2018 WL 6719717, at *5 (Del. Ch. Dec. 19, 2018); *Zucker v. Hassell*, 2016 WL 7011351, at *1 (Del. Ch. Nov. 30, 2016).

Of the two potential routes presented by Rule 23.1—pleading demand excusal with particularity or making a pre-suit demand—the former is a steep road, but the latter is "steeper yet."[54]  By making a pre-suit demand, a stockholder "tacitly concedes" the disinterest and independence of the board to respond.[55]  The board's decision to refuse the demand, therefore, is subject to the business judgment rule. After making a pre-litigation demand, a stockholder plaintiff may not pursue claims challenging the subject matter of the demand; the stockholder is limited to a claim that the board wrongfully refused the demand.[56]  This limitation applies to all

---

[54] *Hassell*, 2016 WL 7011351, at *1.

[55] *Spiegel*, 571 A.2d at 777 ("By electing to make a demand, a shareholder plaintiff tacitly concedes the independence of a majority of the board to respond.  Therefore, when a board refuses a demand, the only issues to be examined are the good faith and reasonableness of its investigation."); *see also Levine*, 591 A.2d at 212 ("[B]y making demand upon a board before filing suit, [a stockholder plaintiff] tacitly concedes the independence of a majority of the board to respond." (alterations added) (citation and internal quotation marks omitted)); *Busch v. Richardson*, 2018 WL 5970776, at *8 & n.75 (Del. Ch. Nov. 14, 2018) ("[A] stockholder plaintiff who makes a demand 'concedes that the board had the requisite independence and disinterest to evaluate the demand objectively,' [and] the 'decision to refuse a plaintiff's demand is afforded the protection of the business judgment rule unless the plaintiff alleges particularized facts that raise a reasonable doubt as to whether the board's decision to refuse the demand was the product of valid business judgment.'" (quoting *Friedman v. Maffei*, 2016 WL 1555331, at *8 (Del. Ch. Apr. 13, 2016) (alteration added)).

[56] *Spiegel*, 571 A.2d at 775 ("A shareholder who makes a demand can no longer argue that demand is excused."); *Grimes*, 673 A.2d at 1218 ("The spent 'arrow' is the right to claim that demand is excused." (citations omitted)).

14

derivative claims arising from the subject matter of the demand, even legal theories not expressly identified by the stockholder or considered by the board.[57]

Having made a pre-suit demand, Plaintiff is on the "steeper road." Accordingly, to survive a motion to dismiss, Plaintiff must plead with particularity facts sufficient to "create a reasonable doubt" that the demand refusal was a valid exercise of the board's business judgment.[58] In *Spiegel*, the Delaware Supreme Court focused the demand-refusal analysis on two issues: "the good faith and reasonableness of [the board's] investigation."[59] Under this framework, Plaintiff "'must allege particularized facts that raise a reasonable doubt that (1) the board's decision to deny the demand was consistent with its duty of care to act on an informed basis, that is, was not grossly negligent; or (2) the board acted in good faith, consistent with its duty of loyalty.'"[60] The two prongs of *Spiegel*—gross

---

[57] *Grimes*, 673 A.2d at 1219 ("[P]laintiff may not bifurcate his theories relating to the same claim . . . [Plaintiff's] demand letter conceded that demand was required for all legal theories arising out of the set of facts described in the demand letter."); Deborah A. Demott & David F. Cavers, *Shareholder Derivative Actions: Law And Practice* § 5.10, at 725 (2018) ("[A] demand implicitly encompasses all legal theories or remedies arising out of the same set of circumstances. Under this rule, there is no incentive to bifurcate or hold back legal theories, in the hope that demand might be excused on the unexpressed claim arising out of the same set of facts." (citing *Grimes*, 673 A2.d at 1219) (footnote omitted)).

[58] *Levine*, 591 A.2d at 210 (quoting *Aronson*, 473 A.2d at 808, 815).

[59] *Spiegel*, 571 A.2d at 777; *see also Levine*, 591 A.2d at 212 (quoting *Speigel*, 571 A.2d at 777); *Richardson*, 2018 WL 5970776, at *8 ("[I]f the board refuses the stockholder's demand, the only issues to be examined are the good faith and reasonableness of its investigation." (citation and internal quotation marks omitted)).

[60] *Richardson*, 2018 WL 5970776, at *8 (quoting *Ironworkers Dist. Council of Phil. & Vicinity Ret. & Pension Plan v. Andreotti*, 2015 WL 2270673, at *24 (Del. Ch. May 8,

negligence and bad faith—are disjunctive, and Plaintiff can survive dismissal by meeting the test under either prong.

### 1. The Amended Complaint fails to plead particularized facts creating a reasonable doubt that the directors acted with due care.

As its chief argument under the first prong of *Spiegel*, Plaintiff contends that the Special Committee and Subcommittee members were conflicted with respect to the litigation demands. Thus, they say, the Board acted with gross negligence in relying on the Special Committee and Subcommittee to respond to the litigation demands.[61] In response, Defendants argue that the tacit concession automatically extends to board committees, and therefore the Court may not consider whether the committee members were conflicted with respect to the demand.[62]

Defendants rely on *Spiegel*, in which the board formed a committee to respond to the plaintiff's pre-suit litigation demand.[63] The stockholder argued that *the board* conceded conflicts by forming the committee.[64] The Delaware Supreme Court rejected this argument, stating:

---

2015)) (citations omitted); *see also Andersen v. Mattel, Inc.*, 2017 WL 218913, at *3 (Del. Ch. Jan. 19, 2017).

[61] Dkt. 47, Pl.'s Omnibus Ans. Br. in Opp'n to Defs.' Mots. to Dismiss the Verified Am. S'holder Deriv. Compl. ("Pl.'s Ans. Br.") at 20.

[62] Dkt. 37, Defs.' Op. Br. at 13–15; Dkt. 51, Defs.' Reply Br. at 4–6, 8.

[63] 571 A.2d at 770.

[64] *Id.*

> The same standard of judicial review is applicable when a board delegates authority to respond to a demand to a special litigation committee. The *issues are solely the good faith and reasonableness of its investigation.*[65]

Based on the facts of *Spiegel* and the above-quoted language, Defendants conclude that *Spiegel* limits the Court's demand-refusal analysis to the good faith and reasonableness of the committee's investigation.[66] Put differently, Defendants say that *Spiegel* precludes the Court from analyzing conflicts at the committee level in a demand-refusal analysis.

Defendants' interpretation of *Spiegel* is reasonable, but it fails to consider two subsequent Delaware Supreme Court decisions: *Grimes*[67] and *Scattered III*.[68]

In *Grimes*, the Supreme Court explained that a demand-refusal analysis should consider whether directors *acted* independently and disinterestedly when responding to a stockholder demand.[69] The Court observed:

> Simply because the composition of the board provides no basis *ex ante* for the stockholder to claim with particularity and consistently with Rule 11 that it is reasonable to doubt that a majority of the board is either interested or not independent, it does not necessarily follow *ex post* that the board in fact **acted** independently, disinterestedly or with

---

[65] *Id.* at 778 (emphasis added).

[66] Dkt. 67, Tr. of Oral Arg. on Defs.' Mots. to Dismiss ("Oral Arg. Tr.") at 20:14–21:10.

[67] 673 A.2d 1207.

[68] *Scattered III*, 701 A.2d 70, *aff'g on other grounds* 1997 WL 187316 (Del. Ch. Apr. 7, 1997) [hereinafter *Scattered II*], *remanded from* 1996 WL 417507 (Del. Ch. July 12, 1996) [hereinafter *Scattered I*].

[69] *Grimes*, 673 A.2d at 1218.

17

due care in response to the demand. A board or a committee of the board may **appear** to be independent, but may not always **act** independently. If a demand is made and rejected, the board rejecting the demand is entitled to the presumption of the business judgment rule unless the stockholder can allege facts with particularity creating a reasonable doubt that the board is entitled to the benefit of the presumption. If there is reason to doubt that the board acted independently or with due care in responding to the demand, the stockholder may have the basis *ex post* to claim wrongful refusal.[70]

In *Scattered III*, the Supreme Court applied its holding of *Grimes* to a board that had delegated review of a demand to a committee.[71] A member of the Chicago Stock Exchange (the "Exchange") demanded that the Exchange board take action to address "systemic corruption."[72] The Exchange's constitution vested an executive committee with the authority to exercise the powers of the full board in between board meetings.[73] The executive committee thus had decision-making power to respond to the demand.[74] A special committee was appointed to investigate the demand and recommend action to the executive committee.[75] After receiving a

---

[70] *Id.* (emphasis in original) (footnotes omitted).

[71] *Scattered III*, 701 A.2d at 75–76.

[72] *Id.* at 71.

[73] *Id.*

[74] *Scattered I*, 1996 WL 417507, at *4.

[75] *Id.* at *2.

18

report from the special committee, the executive committee rejected the demand, and the stockholder filed a derivative action.[76]

At the trial level, the Court of Chancery embraced the defendants' interpretation of *Spiegel*.[77] The court approached the demand-refusal analysis as if the making of the demand conceded the independence and disinterestedness of all the directors at both the board and committee levels. The court stated: "Because under the Exchange's Constitution both the full Board and the Executive Committee were authorized to act on a demand, by virtue of making the Demand, the plaintiffs conceded the disinterest[] and independence of *both* the Executive Committee and the full Board."[78]

The plaintiff appealed, and a new fact emerged while the appeal was pending: "[T]he Special Committee had been created by the full Board, not the Executive Committee."[79] The Supreme Court remanded the case so that the Court of Chancery could consider the new fact. On remand, the Court of Chancery decided that the new fact was immaterial to its analysis.[80]

---

[76] *Id.*

[77] *Id.* at *4.

[78] *Id.*

[79] *Scattered II*, 1997 WL 187316, at *2.

[80] *Id.*

19

On appeal again, the plaintiff argued "that the Court of Chancery erred as a matter of law when it concluded that a demand on an independent board of directors concedes the independence of an executive committee of the board."[81] The Supreme Court agreed. Applying *Grimes*, the Supreme Court explained that a demand-refusal analysis must consider allegations of director bias or self-interest when evaluating whether a board or committee acted independently and in good faith when responding to a demand.[82]

> In a derivative action involving refusal of a demand, any alleged bias or self-interest on the part of the board or a committee authorized to act on that demand should become part of the court's inquiry into whether the board or committee acted independent and in good faith, or whether it conducted a reasonable investigation. If there had been particularized allegations that the Special Committee (as the investigating committee) or the Executive Committee (as the decisionmaking committee) was biased, lacked independence, or failed to conduct a reasonable investigation, such allegations could have created a reasonable doubt that demand was properly refused.[83]

Despite holding that the Court of Chancery erred, the Supreme Court affirmed the dismissal, because the complaint failed to plead particularized facts "cast[ing] a

---

[81] *Scattered III*, 701 A.2d at 73.

[82] *Id.* at 75 (citing *Grimes*, 673 A.2d at 1218–19).

[83] *Id.*

20

reasonable doubt upon the disinterestedness . . . of the [committee] in acting on the demand."[84]

*Grimes* and *Scattered III* demonstrate that the plaintiff's tacit concession does not establish for all purposes the disinterest and independence of every member of the board. Instead, the plaintiff concedes only that the board as a whole would have been capable of considering a demand. Put differently, the plaintiff accepts that the number of board members necessary to carry a vote, typically a majority, lacks conflicts with respect to the demand. Indeed, *Spiegel* contains language stating precisely that proposition: "By electing to make a demand, a shareholder plaintiff tacitly concedes the independence of a *majority of the board* to respond."[85]

The tacit concession doctrine does not go further and prevent a court from considering obvious conflicts or bias when evaluating a board's decision to delegate the demand-review process to a committee. To take an extreme example, consider a board comprising nine independent directors and the CEO. A stockholder sends a

---

[84] *Id.*

[85] *Spiegel*, 571 A.2d at 777 (emphasis added). *See also Rales v. Blasband*, 634 A.2d 927, 935 n.12 (Del. 1993) (citing *Spiegel* and describing the tacit concession as extending to the "majority of the board"); *Levine*, 591 A.2d at 212 (same); *Richardson*, 2018 WL 5970776, at *8 (same); *Charal Inv. Co. v. Rockefeller*, 1995 WL 684869, at *2 (Del. Ch. Nov. 7, 1995) (same); *Thorpe v. CERBCO, Inc.*, 611 A.2d 5, 10 (Del. Ch. 1991) (same); *Mount Moriah Cemetery on Behalf of Dun & Bradstreet Corp. v. Moritz*, 1991 WL 50149, at *3 (Del. Ch. Apr. 4, 1991) (same), *aff'd*, 599 A.2d 413 (Del. 1991); Pl.'s Ans. Br. at 19 ("Plaintiff did not concede[] that each and every individual director [was] capable of making a disinterested and independent decision with respect to the Demand.").

21

demand that the board claw back the CEO's compensation. The board establishes a one-person special committee consisting of the CEO and empowers the committee to respond to the demand. The CEO refuses the demand. In this hypothetical, it is easy to understand why the board's decision to delegate the litigation demand to the CEO could be grossly negligent or evidence of bad faith. A court can only reach this conclusion, however, by analyzing whether the CEO is conflicted.

Under Defendants' reading of *Spiegel*, the making of demand would concede even the disinterestedness and independence of the CEO, such that a reviewing court would have to blind itself to the obvious conflict that the CEO faced when considering the demand. But *Grimes* teaches that when evaluating whether a board has acted in good faith and with due care when responding to a demand, a court must consider whether "the board in fact **acted** independently, disinterestedly or with due care in response to the demand." [86] And *Scattered III* teaches that when a board delegates the demand-review process to a committee, the court must consider whether the members of the committee were "biased [or] lacked independence," in addition to whether the committee conducted a "reasonable investigation."[87]

Accordingly, *Spiegel*'s tacit concession rule applies only to a majority of the Board. Under *Grimes* and *Scattered III*, the Court may evaluate Plaintiff's

---

[86] *Grimes*, 673 A.2d at 1219 (emphasis in original).

[87] *Scattered III*, 701 A.2d at 75 (alteration added).

22

allegations that the Special Committee and the Subcommittee members were incapable of acting disinterestedly in responding to the demands.

Though appropriate for the Court to consider, Plaintiff's committee-level conflicts argument nevertheless fails. As in *Scattered III*, the Amended Complaint fails to allege particularized facts to support conflicts at the committee level. Plaintiff does not allege any facts suggesting a financial or personal benefit to any of the Director Defendants in approving the Separation Agreements or rejecting the litigation demands. Instead, Plaintiff's conflicts argument focuses on the committee members' prior involvement in the initial decision to approve the Separation Agreements. Plaintiff argues that their involvement biased them against the demands.[88]

Plaintiff's prior-involvement theory fails factually. As to the Initial Demand, no Special Committee member was conflicted concerning the request that the Board exercise rights under the Clawback Provisions. A person is not conflicted when

---

[88] Pl.'s Ans. Br. at 20–21 ("[T]he Special Committee was unable to adequately consider Plaintiff's initial demand to *inter alia*, '[c]lawback compensation paid to Smisek from 2012 through his termination with the Company pursuant to the Separation Agreement' as there was not a disinterested majority . . . ." (citations omitted)); *id.* at 21 ("[H]alf of the Special Committee itself was implicated in the wrongdoing by Plaintiff's demand. . . . As Defendants concede, before Plaintiff issued its initial Demand, the Special Committee had already approved Smisek's unconscionable Separation Agreement and had already approved the non-prosecution agreement with the U.S. Attorney's office. A Board simply cannot properly task a Special Committee with investigating its own members' prior wrongful conduct." (citations omitted)).

23

deciding whether to exercise a contractual right for which that person negotiated, at least not by reason of the fact that the person negotiated for the right. Nor is the Special Committee conflicted with respect to the Initial Demand's request to modify clawback policies by virtue of any prior involvement; Plaintiff does not allege that the Special Committee members were involved in the creation of the clawback policies adopted in 2010 and 2008.[89] As to the Supplemental Demand, none of the five directors on the Subcommittee were involved in the decisions to approve the Separation Agreements.[90] Put simply, for the prior-involvement theory of conflicts to have legs, at a minimum, Plaintiff must allege some prior involvement.

Plaintiff's prior-involvement theory of conflicts, therefore, fails to create a reasonable doubt that the Director Defendants acted with due care in empowering the Special Committee. Plaintiff makes two additional arguments, which fare no better.

Plaintiff argues that Jenner's "dual representation" of the Special Committee and United gave rise to a conflict tainting the Special Committee's consideration of the Initial Demand.[91] Plaintiff, however, does not plead the nature of this "dual representation" with any particularity, despite having accessed United's books and

---

[89] Am. Compl. ¶ 71; Pl.'s Ans. Br. at 10.

[90] *Id.*

[91] Pl.'s Ans. Br. at 26.

24

records using Section 220.  Generally, Delaware law allows board members to rely on counsel selected with reasonable care,[92] and Plaintiff does not allege particularized facts impugning the selection of Jenner.  Further, the case on which Plaintiff relies, *Stepak v. Addison*,[93] is distinguishable.  There, the board used the same counsel that defended an alleged criminal to investigate the stockholder demand concerning the criminal acts.[94]  Plaintiff does not allege that Jenner represented Smisek or either of the other executives who received Separation Agreements.  *Stepak*, therefore, does not support Plaintiff's "dual-representation" argument.[95]

Plaintiff also takes issue with the timing of the process.  Plaintiff argues that because the Special Committee approved the Separation Agreements before the federal investigations concluded, the committee members could not have properly informed themselves of all material information reasonably available.[96]  There are multiple problems with Plaintiff's timing theory.  Most critically, the theory focuses on the wrong time: the demand-refusal analysis examines whether the Board was

---

[92] 8 *Del. C.* § 141(e).

[93] 20 F.3d 398 (11th Cir. 1994).

[94] *Id.* at 403-04.

[95] *See also Levine v. Liveris*, 216 F. Supp. 3d 794, 809–10 (E.D. Mich. 2016) (rejecting argument that demand was wrongfully refused because counsel, which had previously represented the company and had a reputation for advising boards to reject stockholder demands, was improperly chosen).

[96] Am. Compl. ¶ 46; Oral Arg. Tr. at 81:3–12.

25

well-informed when it considered the litigation demand, not when making the underlying decision.[97] The argument also assumes that the Board could not act in an informed manner in entering into the Separation Agreements before the conclusion of an internal or external investigation. It is possible that a plaintiff might allege facts that would support an inference of gross negligence if directors acted quite early in a process or before receiving information that they knew to expect. Such a theory would require particularized facts. All Plaintiff has done here is to state that the board acted before the investigations were complete. That is not enough to undercut the presumptions of the business judgment rule.

### 2. The Amended Complaint fails to plead particularized facts creating a reasonable doubt that the directors acted in good faith.

The second inquiry under the *Spiegel* framework assesses the Board's good faith in considering the litigation demands. "To show bad faith, [a plaintiff] must plead with particularity that the Board 'intentionally act[ed] in disregard of the Company's best interest in deciding not to pursue the litigation the Plaintiff

---

[97] *Richardson*, 2018 WL 5970776, at *9 ("A board acts with gross negligence by failing to 'properly inform itself of material information reasonably available to it *before refusing the demand*.'" (citing *Andersen*, 2017 WL 218913, at *4) (emphasis added) (internal citation omitted)). *See also Ironworkers*, 2015 WL 2270673, at *26 (emphasizing that the wrongful demand refusal standard requires reasonable doubt as to the directors' actions in refusing the demand, "*not* doubt about the propriety of the underlying conduct" (emphasis in original)).

demanded.'"[98]  "When directors decide to reject a demand, this court 'takes into account not only the defendants' countervailing legal arguments, but also the other relevant factors considered by the board—*e.g.*, whether the costs of pursuing the claims outweigh the expected recovery.'"[99]  Where "[t]he Board's justifications for refusing [Plaintiff's] demand fall within 'the bounds of reasonable judgment' [this] is fatal to [Plaintiff's] claim that the refusal was made in bad faith."[100]

To show bad faith, Plaintiff argues only that the terms of the Separation Agreements were so "egregious" and "irrational" that refusing Plaintiff's litigation demands was "inexplicable."[101] The terms of the Separation Agreements, standing alone, are not sufficient to support a claim that the Board acted in bad faith in refusing the litigation demands.  This court has recognized many valid business reasons for entering into separation agreements.[102]  Plaintiff fails to address other

---

[98] *Richardson*, 2018 WL 5970776, at *9 (quoting *Maffei*, 2016 WL 1555331, at *12); *see also id.* ("Demonstrating that directors have breached their duty of loyalty by acting in bad faith goes far beyond showing a questionable or debatable decision on their part." (quoting *Andersen*, 2017 WL 218913, at *5)).

[99] *Richardson*, 2018 WL 5970776, at *9.

[100] *Maffei*, 2016 WL 1555331, at *15 (quoting *Crescent/Mach I P'rs, L.P., v. Turner*, 846 A.2d 963, 981 (Del. Ch. 2000)); *see also Ironworkers*, 2015 WL 2270673, at *32 ("[A] disagreement, however vehement, with the conclusion of an independent and adequately represented committee is not the same as pleading particularized facts that create a reasonable doubt that the Board acted in what it perceived as the best interests of the corporation." (emphasis omitted)).

[101] Am. Compl. ¶ 69; Pl.'s Ans. Br. at 29–30.

[102] *See, e.g.*, *Seinfeld v. Slager*, 2012 WL 2501105, at *6 (Del. Ch. Feb. 29, 2016) (recognizing a smooth transfer of power and preventing future embarrassment as valid

relevant factors considered by Special Committee and Subcommittee when rejecting the demand, such as "concern of disruption to or distraction from the business; the efficacy of the requested action, and the actions United [had] already taken on its own initiative as a result of its investigation and in response to [the] events and government resolutions."[103] The Special Committee expressed concern that the modifications to United's clawback policies requested by Plaintiff "were inconsistent with prevailing industry practice."[104] These concerns fall within the bounds of reasonable judgment.

For these reasons, Plaintiff fails to allege adequately that the Board acted in bad faith when responding to the litigation demands.

## B. Counts II and III: Waste and Unjust Enrichment

In *Grimes*, the Supreme Court held that "since the making of a pre-suit demand concedes that demand is required, the concession should apply 'to all or any

---

business reasons for entering into a separation agreement; finding that retaining executives at a time of serious company difficulties was a rational business reason for offering amended severance agreements); *Friedman v. Dolan*, 2015 WL 4040806, at *8 (Del. Ch. June 30, 2015) (recognizing that "[s]everance agreements can be used to ensure cooperation from executives or to secure other benefits"); *Zucker v. Andreessen*, 2012 WL 2366448, at *9 (Del. Ch. June 21, 2012) (recognizing that preserving peace amongst directors and establishing unanimity during CEO's exit as valid business reasons for entering agreement); *In re Walt Disney Co. Deriv. Litig.*, 731 A.2d 342, 364 (Del. Ch. 1998), *aff'd sub nom. Brehm*, 746 A.2d 244 (recognizing that avoiding the risk and expense of litigation as valid business reasons to pay executive severance benefits bargained for under the employment agreement).

[103] Am. Compl. Ex. A at 3; *see also id.* Ex. C at 2–3.

[104] *Id.* Ex. A at 3.

part of the transaction, or series of connected transactions, out of which the [demand] arose.'"[105] The policy behind this standard is to prevent an "undue risk of harassment" whereby a stockholder could reserve theories or remedies and later argue "that demand is excused as to other legal theories or remedies arising out of the same set of circumstances as set forth in the demand letter . . . ."[106] If the waste and unjust enrichment claims arise from the same underlying facts that are the subject of the litigation demands, then the plaintiff cannot proceed without showing demand refusal.[107]

The Amended Complaint reflects that Plaintiff bases its waste and unjust enrichment claims on the Separation Agreements. Plaintiff's waste and unjust

---

[105] *Grimes*, 673 A.2d at 1219–20 (quoting Restatement (Second) of Judgments § 24 (Am. Law Inst. 1982)).

[106] *Id.* at 1220.

[107] *See, e.g.*, *Grimes*, 673 A.2d at 1219 ("[P]laintiff may not bifurcate his theories relating to the same claim. Thus, demand having been made as to the propriety of the Agreements, it cannot be excused as to the claim that the Agreements constituted waste, excessive compensation or was the product of a lack of due care."); *Andersen*, 2017 WL 218913 at *1 (dismissing claims of fiduciary duty, unjust enrichment, and waste where plaintiff failed to adequately plead wrongful demand refusal); *Maffei*, 2016 WL 1555331 at *1 (same); *Liveris*, 216 F. Supp. 3d at 799 (E.D. Mich. 2016) (applying Delaware law and dismissing plaintiff's waste and unjust enrichment claims for failure to sufficiently plead wrongful demand refusal). *Cf. Calma on Behalf of Citrix Sys., Inc. v. Templeton*, 114 A.3d 563, 591 (Del. Ch. 2015) (dismissing claim for unjust enrichment in the demand refusal context where plaintiff failed to adequately allege a claim for fiduciary breach, observing "[a]t the pleadings stage, an unjust enrichment claim that is entirely duplicative of a breach of fiduciary duty claim—*i.e.*, where both claims are premised on the same purported breach of fiduciary duty—is frequently treated in the same manner when resolving a motion to dismiss" (internal quotation marks omitted)).

29

enrichment claims merely repackage complaints concerning the Separation Agreements under different legal theories.[108]

For these reasons, Counts II and III of the Amended Complaint are subject to the demand-refusal analysis, and they fail for the same reasons as Count I.[109]

## III.  CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss Counts I, II, and III of the Amended Complaint are GRANTED.

---

[108] Count II incorporates by reference all allegations supporting Count I of the Amended Complaint.  Am. Compl. ¶ 78 at p. 38.  The factual averments of Count II are:  "The Director Defendants wasted United's corporate assets by refusing to clawback compensation paid to the senior executives involved in the bribery scheme despite being empowered to do so by the Company's policies, by entering into the Separation Agreement, and agreements like it, and by subsequently failing to rescind the same.  The Board allowed Smisek who was largely responsible for United's problems, to receive an unconscionable sum of $37 million in exchange for breaking the law."  *Id.* ¶ 80 at p. 39.  Count III incorporates by reference all allegations supporting Counts I and II of the Amended Complaint.  Am. Compl. ¶ 84 at p.39.  The factual averments of Count III are:  "By his wrongful acts, Smisek was unjustly enriched of at the expenses and to the detriment of United, specifically from the severance package awarded on September 8, 2015."  *Id.* ¶ 85 at p.40.

[109] In the Amended Complaint, Plaintiff alleges facts concerning the Board's compensation, audit, and governance committees.  Am. Compl. ¶¶ 70–86 at pp. 30–37.  By failing to brief the relevance of these facts to any of Plaintiff's claims, Plaintiff waived the opportunity to do so.  *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").